ORAL ARGUMENT NOT YET SCHEDULED

No. 23-3028

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JESSE R. BENTON,

*Defendant-Appellant.*

———————————————

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-cr-00569-TNM-1 (Hon. Trevor N. McFadden)

———————————————

## OPENING BRIEF FOR DEFENDANT-APPELLANT
## JESSE R. BENTON

———————————————

Matthew D. McGill
  *Counsel of Record*
Nick Harper
M. Christian Talley
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
mmcgill@gibsondunn.com

*Counsel for Defendant-Appellant
Jesse R. Benton*

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), appellant Jesse R. Benton certifies as follows:

### A.    Parties

This appeal arises from a criminal proceeding involving the defendant-appellant, Jesse R. Benton, and the plaintiff-appellee, the United States of America.  The parties on appeal both appeared below.  There are no other parties on appeal, intervenors, or amici.

### B.    Rulings Under Review

The principal ruling under review is the judgment of conviction entered by the U.S. District Court for the District of Columbia (McFadden, J.), on February 17, 2023, reflecting that the defendant was found guilty by a jury of one count of conspiracy, 18 U.S.C. § 371; one count of causing and aiding and abetting the contribution of a foreign national, 52 U.S.C. §§ 30121 & 30109(d)(1)(A)(i) and 18 U.S.C. § 2; one count of making a contribution in the name of another, 52 U.S.C. §§ 30122 & 30109(d)(1)(A)(i) and 18 U.S.C. § 2; and three counts of causing and aiding and abetting the entry of a false record, 18 U.S.C. §§ 1519 & 2.  *See* JA__–__[Dkts.77-78].  Mr. Benton also seeks review of the district

i

court's order denying Mr. Benton's motion to dismiss the indictment, JA__[09/23/22.Tr.44:1-2], the district court's order denying Mr. Benton's motion for acquittal or for a new trial, JA__[Dkt.70], and the district court's imposition of a sentence of 18 months' imprisonment and 24 months' supervised release, JA__, __[2/17/23.Tr.49:14-22;Dkt.77].

### C.    Related Cases

Mr. Benton was indicted with a co-defendant, Roy Douglas "Doug" Wead, whose prosecution was assigned Case No. 1:21-cr-00569-TNM-2 in the district court.  A few months later, however, Wead passed away, and the Government thereafter moved to abate its prosecution and close the case as to Wead only.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................iv

GLOSSARY ..........................................................................................xi

INTRODUCTION ...................................................................................1

JURISDICTIONAL STATEMENT ...........................................................5

STATEMENT OF ISSUES......................................................................5

STATUTES ...........................................................................................6

STATEMENT OF THE CASE .................................................................6

SUMMARY OF ARGUMENT ................................................................11

STANDARDS OF REVIEW ...................................................................16

ARGUMENT .......................................................................................16

    I.    The FECA Convictions Are Invalid .....................................16

    II.    The District Court Erred In Admitting A Prior
            Conviction Pardoned On Grounds Of Innocence And
            In Relying On The Conviction At Sentencing ......................30

    III.    The District Court's Erroneous "Limiting
            Instruction" Aggravated The Prejudice ..............................39

    IV.    FECA's Election-Specific False Reporting
            Framework Precludes Liability Under Sarbanes-
            Oxley ...............................................................................45

CONCLUSION ....................................................................................56

CERTIFICATE OF COMPLIANCE

STATUTORY ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*,
   461 U.S. 273 (1983)................................................................47, 54

*Brown v. Gen. Servs. Admin.*,
   425 U.S. 820 (1976)...........................................................47, 52, 53

*Buckley v. Valeo*,
   424 U.S. 1 (1976)....................................................................20, 45

*\*Busic v. United States*,
   446 U.S. 398 (1980)....................................................15, 47, 49, 50

*Chavez v. City of Albuquerque*,
   402 F.3d 1039 (10th Cir. 2005).......................................................41

*EC Term of Years Tr. v. United States*,
   550 U.S. 429 (2007)................................................................47, 53

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012).......................................................................33

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
   353 U.S. 222 (1957).......................................................................48

*Francis v. Franklin*,
   471 U.S. 307 (1985).......................................................................44

*Galliano v. U.S. Postal Serv.*,
   836 F.2d 1362 (D.C. Cir. 1988).......................................45, 46, 47, 53

*Herrera v. Collins*,
   506 U.S. 390 (1993).......................................................................32

*Hirschberg v. CFTC*,
   414 F.3d 679 (7th Cir. 2005)..........................................................16

*Ingber v. Enzor*,
   841 F.2d 450 (2d Cir. 1988)...........................................................32

*Authorities upon which we chiefly rely are marked with asterisks.*

iv

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*Johansen v. United States*,
343 U.S. 427 (1952)................................................................52

*\*Lorance v. Commandant, U.S. Disciplinary Barracks*,
13 F.4th 1150 (10th Cir. 2021) ....................................... 16, 32

*Lovely v. United States*,
169 F.2d 386 (4th Cir. 1948)............................................. 40

*Mateo v. United States*,
398 F.3d 126 (1st Cir. 2005) ............................................. 38

*McBoyle v. United States*,
283 U.S. 25 (1931)................................................................56

*\*Mortensen v. United States*,
322 U.S. 369 (1944)........................................................ 18, 19

*\*Neder v. United States*,
527 U.S. 1 (1999)......................................... 20, 23, 24, 25

*Otis v. Walter*,
24 U.S. (11 Wheat.) 192 (1826)........................................ 18

*Patten v. District of Columbia*,
9 F.4th 921 (D.C. Cir. 2021) ....................................... 48, 52

*Preiser v. Rodriguez*,
411 U.S. 475 (1973)................................................. 47, 52, 53

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)......................................................... 47, 52

*Robinson v. United States*,
142 F.2d 431 (8th Cir. 1944)......................................... 51, 53

*Rosales-Mireles v. United States*,
138 S. Ct. 1897 (2018)........................................................ 39

*Schwartz v. United States*,
976 F.2d 213 (4th Cir. 1992)............................................. 32

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

*Simpson v. United States*,
  435 U.S. 6 (1978)................................................. 47, 49, 50, 52

*United States v. Barbosa*,
  271 F.3d 438 (3d Cir. 2001) ............................................. 23

*United States v. Batchelder*,
  442 U.S. 114 (1979)...................................................... 51

*United States v. Benton*,
  890 F.3d 697 (8th Cir. 2018)............................................ 36

*United States v. Braxtonbrown-Smith*,
  278 F.3d 1348 (D.C. Cir. 2002) ......................................... 16

*United States v. Carter*,
  482 F.2d 738 (D.C. Cir. 1973) ........................................ 3, 36

*United States v. Chase*,
  135 U.S. 255 (1890)...................................................... 48

*United States v. Crowder*,
  87 F.3d 1405 (D.C. Cir. 1996) .......................................... 40

*United States v. Davis*,
  139 S. Ct. 2319 (2019)................................................... 34

*United States v. Davis*,
  547 F.3d 520 (6th Cir. 2008)............................................ 41

*United States v. DeFries*,
  129 F.3d 1293 (D.C. Cir. 1997) ...................................... 21, 23

*United States v. Demko*,
  385 U.S. 149 (1966)...................................................... 48

*United States v. Fawley*,
  137 F.3d 458 (7th Cir. 1998)............................................ 21

*United States v. Harrison*,
  103 F.3d 986 (D.C. Cir. 1997) .......................................... 26

vi

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*United States v. Henry*,
  528 F.2d 661 (D.C. Cir. 1976) ........................................................ 43, 44

*United States v. Hillie*,
  39 F.4th 674 (D.C. Cir. 2022) ............................................................. 26

*United States v. Johnson*,
  231 F.3d 43 (D.C. Cir. 2000) ......................................................... 36, 44

*United States v. Johnson*,
  27 F.3d 1186 (6th Cir. 1994) ............................................................... 41

*United States v. Johnson*,
  457 U.S. 537 (1982) ........................................................................... 32

*United States v. Klein*,
  80 U.S. (13 Wall.) 128 (1871) ....................................................... 32, 36

*United States v. Lampkin*,
  159 F.3d 607 (D.C. Cir. 1998) ............................................................ 44

*United States v. LaPorta*,
  46 F.3d 152 (2d Cir. 1994) ........................................................... 48, 51

*\*United States v. McCauley*,
  983 F.3d 690 (4th Cir. 2020) ................................. 18, 19, 21, 22, 27, 28

*United States v. McDonald*,
  991 F.2d 866 (D.C. Cir. 1993) ............................................................ 38

*United States v. Munoz-Gonzalez*,
  812 F.3d 439 (5th Cir. 2016) ............................................................. 33

*United States v. Perkins*,
  161 F.3d 66 (D.C. Cir. 1998) ............................................................. 16

*United States v. Rawlings*,
  73 F.3d 1145 (D.C. Cir. 1996) ........................................................... 21

*United States v. Smart*,
  98 F.3d 1379 (D.C. Cir. 1996) ....................................................... 37, 44

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

*United States v. Smith*,
    561 F.3d 934 (9th Cir. 2009)................................................21

*United States v. Stein*,
    37 F.3d 1407 (9th Cir. 1994)..............................................44

*United States v. Takhalov*,
    827 F.3d 1307 (11th Cir. 2016).........................................23

*United States v. Tate*,
    630 F.3d 194 (D.C. Cir. 2011)...........................................43

*United States v. Turner*,
    21 F.4th 862 (D.C. Cir. 2022)...........................................16

*United States v. Verners*,
    53 F.3d 291 (10th Cir. 1995)........................................18, 19

*United States v. Williams*,
    553 U.S. 285 (2008)..........................................................33

*United States v. Wilson*,
    240 F.3d 39 (D.C. Cir. 2001).......................................23, 25

*United States v. Wilson*,
    26 F.3d 142 (D.C. Cir. 1994).............................................43

*Valdes v. United States*,
    475 F.3d 1319 (D.C. Cir. 2007)....................................16, 26

*Williams v. United States*,
    327 U.S. 711 (1946)...........................................50, 51, 56

*In re Winship*, 397 U.S. 358 (1970)................................20

*Yates v. United States*,
    574 U.S. 528 (2015)....................................................48, 52

### Statutes

18 U.S.C. § 2 ...............................................................9

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

18 U.S.C. § 924(c) ...................................................................50

18 U.S.C. § 1519 .......................................4, 9, 10, 45, 48, 51, 52, 54, 55, 56

18 U.S.C. § 3231 .......................................................................5

18 U.S.C. § 3742 .......................................................................5

28 U.S.C. § 1291 .......................................................................5

39 U.S.C. § 3005 ......................................................................53

52 U.S.C. § 30107(e) .................................................................54

52 U.S.C. § 30109(a)(4)(A)(i) .......................................................46

52 U.S.C. § 30109(d) .................................................................46

52 U.S.C. § 30109(d)(1)(A) .......................................................9, 48

52 U.S.C. § 30109(d)(1)(A)(i) .......................................................54

52 U.S.C. § 30109(d)(2) .............................................................46

52 U.S.C. § 30121 ..................................................................9, 17

52 U.S.C. § 30121(a)(1)(A) ..........................................................17

52 U.S.C. § 30122 ..................................................................9, 17

Pub. L. No. 94-283, Title I, §§ 105, 109 (May 11, 1976) .........................51

## Other Authorities

Charles T. McCormick, *Evidence* (1954)...............................................37

1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal
    Evidence* (4th ed. 2013).........................................................41

H.R. Rep. No. 94-917 (1976)............................................................46

Henry Weihofen, *The Effect of a Pardon*, 88 U. Pa. L. Rev.
    (1939)..........................................................................31

# TABLE OF AUTHORITIES
### *(continued)*

**Page(s)**

Dep't of Justice, *Federal Prosecution of Election Offenses* (5th ed. 1988) .......................................................................55

Dep't of Justice, *Federal Prosecution of Election Offenses* (8th ed. 2017) .......................................................................55

U.S. Sentencing Comm'n, *Amendment to the Sentencing Guidelines* (Aug. 31, 2023), https://tinyurl.com/43swsbbe .................38

U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* (April 27, 2023), https://tinyurl.com/45tc24wc ...............38

U.S. Sentencing Guidelines Ch. 5, Pt. A.................................................38

U.S. Sentencing Guidelines § 4A1.2(j) & n.10 .......................................38

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ................................................................5

Fed. R. Evid. 404 ................................................................ 13, 32, 42

Fed. R. Evid. 609 ................................................................ 13, 31

## Constitutional Provisions

U.S. Const. amend. I ....................................................... 20, 45

U.S. Const. amend. VI........................................................ 20

x

# GLOSSARY

**FBI**              Federal Bureau of Investigation

**FECA**             Federal Election Campaign Act

**FEC**              Federal Election Commission

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a), Mr. Benton respectfully requests oral argument.  This appeal's outcome hinges on important and recurring questions of law—including how the government may charge campaign-finance violations, what elements it must prove, and whether it may bolster its case-in-chief with a prior conviction that the President pardoned on grounds of innocence.  Oral argument would substantially assist the Court in resolution of this appeal.

## INTRODUCTION

The jury convicted Jesse Benton in this case because it misunderstood the law.  Mr. Benton was accused of serving as a conduit for a payment from a foreign national, Roman Vasilenko, to the Trump campaign in 2016.  Vasilenko had no interest in U.S. politics; he wanted a photo with then-candidate Donald Trump at a Philadelphia campaign event that Vasilenko could use to promote his business ventures abroad.  The Government nonetheless alleged that Vasilenko's payment was a "contribution" by a foreign national and a conduit "contribution"—both of which are illegal under the Federal Election Campaign Act ("FECA").  But the jury was not properly instructed on the law, and the Government failed to meet its evidentiary burden under the proper legal standard.

FECA specifically defines a "contribution" as money given "for the purpose of influencing an election."  In this case, because the Government alleged that Vasilenko made the contribution, the Government had to prove that Vasilenko had "the purpose"—that is, a primary purpose—of swaying the election.  Yet the jury was never told this; the jury instructions instead wrongly suggested that *anyone*'s purpose counts and said nothing about the necessary degree of purpose.  There is no doubt that

the jury was misled.  *The Government itself* conceded post-trial that the language in the instructions is "unclear" about whose purpose matters under the statute.  And it made that belated concession only after hammering *Mr. Benton*'s supposed purpose to influence the election at trial. That error was highly prejudicial, particularly in a case where the jury deliberated for more than two days—almost as long as the entire trial.

The Government also failed to meet its evidentiary burden under the correct legal standard.  The evidence at trial on Vasilenko's purpose was bare bones.  The Government did not call Vasilenko to testify or even interview him.  What circumstantial evidence there was established that Vasilenko is a Russian businessman preoccupied with generating media buzz about his life and business exploits abroad—not that he cared at all about the outcome of the 2016 election.  The district court thought it was a "close" call whether the Government had proved *any* purpose to influence an election.  When evaluated under the proper legal standard—*primary* purpose—the Government's evidence falls far short.

The desire to bolster a weak case explains the Government's insistence on admitting Mr. Benton's prior, pardoned conviction.  Mr. Benton was convicted in 2016 of causing the submission of false reports to the

2

Federal Election Commission ("FEC"). The President unconditionally pardoned him in 2020. The reason for the pardon, according to a contemporaneous White House press release, was that the law under which Mr. Benton was convicted was "unclear and not well established at the time." The pardon thus represented the President's conclusive determination that Mr. Benton was innocent because he lacked fair notice and did not willfully violate the law. That pardon rendered Mr. Benton's conviction void and inadmissible, yet the district court admitted it anyway, repudiating the President's judgment. And the erroneous admission of that prior conviction inflicted prejudice "well-nigh inescapable." *United States v. Carter*, 482 F.2d 738, 740 (D.C. Cir. 1973). The district court further erred by using that pardoned conviction to prolong Mr. Benton's sentence, in violation of the Sentencing Guidelines.

The district court compounded the prejudice to Mr. Benton with another erroneous instruction—that the prior conviction could be used to establish Mr. Benton's "identity" or "modus operandi" as a serial campaign-finance violator. The district court's instruction literally invited the jury to convict if it determined that Mr. Benton was "the same person" previously convicted in 2016. That violated hornbook evidence law.

3

When a defendant's identity is *undisputed*, as it was here, a prior convic-tion supposedly establishing "identity" reduces to bare propensity evi-dence.  And that's exactly what happened:  The district court and the Government told the jury that it could convict Mr. Benton if he is "the same person" previously convicted.  The jury no doubt was swayed by that erroneous instruction, and the Government cannot meet its burden of proving otherwise.

Finally, despite bringing its other charges under FECA, the Gov-ernment charged Mr. Benton under Section 1519 of the Sarbanes-Oxley Act, a general false-records statute, for causing Trump's campaign com-mittees to submit false reports to the FEC.  But well-established canons of statutory construction, buttressed by principles of lenity and fair warn-ing, require the Government to prosecute election-specific cases under FECA, the election-specific statute that Congress meticulously designed.  The Government cannot end run that finely wrought, First Amendment-sensitive statute in favor of an easier path to conviction under a more general statute with higher penalties and a lower mens rea requirement.

For those reasons, Mr. Benton is entitled to the vacatur of his sen-tence and reversal of his convictions.  At a minimum he is entitled to a

new trial at which the Government must present its case to a properly instructed jury, without the taint of a prior, improperly admitted conviction.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case under 18 U.S.C. § 3231. The district court entered its judgment of conviction on February 17, 2023. JA__[Dkt.77]. Mr. Benton timely filed his notice of appeal on March 2, 2023. JA__[Dkt.79]; Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether Mr. Benton's FECA convictions must be reversed because the jury was not instructed, and the Government did not prove, that Roman Vasilenko, a foreign national, made a payment with the primary purpose of influencing a federal election.

2.    Whether the district court prejudicially erred by admitting as substantive evidence a prior conviction pardoned on the basis of innocence and by using the conviction to prolong Mr. Benton's sentence.

5

3. Whether the district court prejudicially erred by instructing the jury that Mr. Benton's prior conviction could be used as "identity" or "modus operandi" evidence when Mr. Benton's identity was undisputed.

4. Whether FECA's detailed regime prohibiting election-related false reports to the FEC bars the Government from prosecuting Mr. Benton for the same conduct under Sarbanes-Oxley's generally worded false-records proscription.

### STATUTES

Pertinent statutes are reproduced in the Addendum at the end of this brief.

### STATEMENT OF THE CASE

**A.** Mr. Benton's criminal convictions arise from his efforts to help a Russian businessman, Roman Vasilenko, obtain a photograph with then-presidential candidate Donald Trump in 2016. Vasilenko first became interested in visiting the United States in March 2016 during discussions with Doug Wead. JA__[Dkt.64-1]. Wead and Vasilenko both were in the multilevel-marketing business and had a longstanding relationship. JA__, __[11/10/22.PM.Tr.83:2-3,84:19-20]. Wead

communicated with Vasilenko via emails with Vasilenko's translator, Olga Kovalova.  JA__[Dkt.64-1].

The initial plan for Vasilenko's visit had nothing to do with politics. Wead suggested that Vasilenko could attend an awards ceremony in the United States put on by Wead, where Vasilenko could meet a celebrity. JA__, __[11/10/22.AM.Tr.105:15-20,112:4-6].  Wead suggested eleven individuals that he believed Vasilenko might be interested in meeting: Maria Sharapova, Laura Bush, Steven Seagal, former President Jimmy Carter, Viacheslav Fetisov, Vladislav Tretiak, Michelle Obama, Muhammed Ali, Oprah Winfrey, and Mikhail Baryshnikov.  JA__[Dkt.64-1]. Kovalova replied that Vasilenko was interested in meeting Oprah Winfrey, Steven Seagal, Vladislav Tretiak, and former President Carter.  *Id.*

Wead, however, struggled to attract celebrities to the event.  *See, e.g.*, JA__[11/10/22.PM.Tr.5:17-20].  Eventually, he suggested as an alternative that Vasilenko could meet and get a photo with then-candidate Trump at a campaign event.  JA__[*Id.*at.6:5-12].  Vasilenko agreed, and Wead reached out to Mr. Benton to assist in booking tickets and arranging the photo op.  JA__–__[*Id.*at.9:14-10:1].

7

Mr. Benton booked two tickets for Vasilenko and Wead for a September 2016 Philadelphia campaign event and helped arrange a hotel and logistics. JA__[11/10/22.PM.Tr.38:1-19]. Vasilenko wired $100,000 to Mr. Benton for his assistance. JA__[*Id.*at.30:1-20]. Vasilenko and Trump then met briefly at the campaign event and had their picture taken. JA__[*Id.*at.49:23-25]. In the month after the event, Vasilenko's translator repeatedly emailed Wead asking about the photo. JA__, __, __[*Id.*at.59:11-14,62:2-6,65:18-21]. When Vasilenko eventually obtained the photo, he posted the picture (with his company logo overlaid) to his Instagram account. JA__–__[*Id.*at.117:15-118:16]. Vasilenko apparently never communicated anything to the Trump campaign, or ever sought anything from Trump. JA__[*Id.*at.119:3-17].

Mr. Benton paid the Republican National Committee ("RNC") $25,000 for the tickets, providing his own name as the "contributor." JA__[11/10/22.PM.Tr.68:9-16]. The RNC and two related political committees later reported to the FEC that Mr. Benton had made contributions to their committees in securing the tickets. JA__–__[*Id.*at.79:16-80:18].

8

**B.**    In September 2021, the Government obtained a six-count indictment of Mr. Benton: one conspiracy count and five substantive counts.[1]  JA__–__[Dkt.1¶¶19–64].  The Government brought two of the substantive counts under FECA: one for soliciting a contribution by a foreign national (Vasilenko), and another for serving as a conduit for a contribution by Vasilenko.  52 U.S.C. §§ 30121, 30122, 30109(d)(1)(A); 18 U.S.C. § 2.

The Government also charged Mr. Benton with causing three political committees to make false reports to the FEC, on the ground that the committees falsely reported the payment in question as coming from Mr. Benton rather than Vasilenko.  Instead of also bringing those charges under FECA—which specifically prohibits false reports to the FEC, 52 U.S.C. § 30109(d)(1)(A)—the Government charged Mr. Benton with three counts under Section 1519 of the Sarbanes-Oxley Act.  Section 1519 prohibits (among other things) "mak[ing] a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the

_____

[1] Wead also was indicted, but he passed away before trial.

9

jurisdiction of any department or agency of the United States." 18 U.S.C. § 1519.

At Mr. Benton's trial on those charges, Vasilenko did not testify. The Government's main witness instead was an FBI agent, who admitted that the FBI never interviewed Vasilenko. JA__–__[11/10/22.PM.Tr.123:17-124:12]. The Government also presented no materials written by Vasilenko himself. It relied instead on a few emails from Vasilenko's translator, Kovalova, who likewise did not testify.

The Government also introduced at trial Mr. Benton's prior conviction under FECA and other federal statutes. That conviction related to activities that Mr. Benton had undertaken in Iowa on behalf of Ron Paul's presidential campaign in 2012. President Trump fully and unconditionally pardoned Mr. Benton for that conviction in 2020. *See, e.g.*, JA__–__[9/23/22.Tr.51:24-52:1]. The district court in this case nonetheless instructed the jury that it could use the prior conviction to determine whether Mr. Benton "knowingly" and "willfully" violated the campaign-finance laws, and to decide whether Mr. Benton was "the same person" who was previously convicted in 2016. JA__[11/14/22.PM.Tr.68:4-17].

After a three-and-a-half-day trial, followed by more than two days of deliberations, the jury convicted Mr. Benton on all counts. JA__[Dkt.61]. The district court denied Mr. Benton's post-judgment motion for acquittal and a new trial, although it acknowledged that Mr. Benton presented multiple "close," "interesting," and "difficult" questions. JA__, __[11/14/22.AM.Tr.140:13-16;Dkt.70.at.5]. The district court later imposed a sentence of 18 months' imprisonment and 24 months' supervised release, relying in part on Mr. Benton's pardoned prior conviction. JA__[Dkt.77]. The district court and a motions panel of this Court denied Mr. Benton bail pending appeal. JA__[2/17/23.Minute.Order]; Doc. 2008128 (per curiam order).

## SUMMARY OF ARGUMENT

Mr. Benton's convictions and sentence must be set aside for multiple, independent reasons.

**I.** The jury was not instructed on—and the Government did not prove—key elements of the FECA charges. Mr. Benton's FECA convictions turn on whether Roman Vasilenko, a foreign national, made a "contribution." Under FECA, a payment of money is a "contribution" only if the person paying has "*the* purpose"—meaning the *primary* purpose—of

11

influencing a federal election. But the jury was never instructed that it had to make *any* finding about Vasilenko's purpose, let alone his primary purpose. Instead, in terms the Government has conceded were "unclear," the jury instructions suggested that *any* individual's purpose to influence the election would suffice to convict. The Government then compounded the confusion by emphasizing *Mr. Benton's* supposed purpose in testimony and at closing, undercutting Mr. Benton's central defense that Vasilenko made the payment in order to obtain a photo with a celebrity, not to influence U.S. politics. Because that error was highly prejudicial, Mr. Benton is entitled to a new trial on the FECA counts at a bare minimum.

Reversal of the FECA convictions in fact is required, however, because the Government failed to offer sufficient—indeed *any*—evidence of Vasilenko's primary purpose. Vasilenko never testified, and not a shred of circumstantial evidence suggested that Vasilenko was more concerned with influencing a U.S. presidential election than with obtaining a photograph with a celebrity. The district court thus recognized that Vasilenko's purpose was "difficult to prove" and that the Government had presented a "mixed motives" case at best. But mixed motives won't cut it to prove a *primary* purpose—certainly not beyond a reasonable doubt.

**II.**    Mr. Benton is entitled to a new trial on all counts—or at a minimum a resentencing—in light of the erroneous admission of, and reliance on, Mr. Benton's pardoned conviction.  Mr. Benton was pardoned because, according to a contemporaneous White House press release, the reporting requirement he was previously convicted of violating was "unclear and not well established at the time."  That statement reflects the President's view that Mr. Benton was innocent of the prior false-reporting conviction.  Mr. Benton could not have violated—much less "knowingly" or "willfully" violated—legal obligations that were unclear and failed to provide constitutionally required fair notice.

Innocence-based pardoned convictions like Mr. Benton's cannot be used against the defendant at a subsequent criminal trial.  They are void ab initio and therefore cannot be used for impeachment under Rule 609 or as prior "crimes" under Rule 404.  The district court's decision to admit Mr. Benton's prior conviction contravened the President's judgment that he is innocent of those offenses and improperly swayed the jury to convict.

At a minimum, the district court's reliance on Mr. Benton's pardoned conviction at sentencing requires vacating Mr. Benton's sentence. The Sentencing Guidelines provide that convictions pardoned based on

13

"innocence or errors of law" should not be counted in calculating a defendant's criminal-history score.  Yet the district court did just that in sentencing Mr. Benton.

**III.**     Mr. Benton also is entitled to a new trial on all counts because of the district court's erroneous "limiting instruction" on that prior conviction.  The district court, at the Government's insistence, believed that the prior conviction was relevant to establishing Mr. Benton's "identity" and his "modus operandi" as a serial campaign-finance offender.  But evidence of "identity" is relevant only when the defendant asserts a mistaken-identity defense.

Here, Mr. Benton's identity was never disputed.  When identity is undisputed, a prior conviction amounts to nothing more than bare propensity evidence: Convict the defendant here because he was also convicted there.  That's exactly what the district court's instructions said, telling jurors that it suggested Mr. Benton's guilt if he was "the same person" previously convicted for similar offenses.  Directing a jury to convict because the defendant has a criminal record is a paradigmatic reversible error.

**IV.**    Mr. Benton's Sarbanes-Oxley convictions also must be reversed.  Under longstanding principles of statutory construction, a specific, comprehensive statutory scheme trumps more general provisions where they overlap.  That is particularly so, as the Supreme Court has explained, in criminal cases, where a person's liberty is on the line.  *Busic v. United States*, 446 U.S. 398, 406 (1980).

That principle is squarely implicated here.  The Government must bring charges involving false reports to the FEC under FECA, a finely wrought, First Amendment-sensitive regime designed specifically to regulate election cases, rather than under Sarbanes-Oxley's general false-records proscription.  FECA has lower penalties and a higher mens rea requirement.  It is the more difficult conviction to obtain by design.  That's why the Government chose to prosecute the conduct covered by FECA using Sarbanes-Oxley.  But FECA, reinforced by principles of lenity and fair notice, requires the government to prosecute under the statute designed to govern these circumstances—not to end run it for the sake of expedience.

15

## STANDARDS OF REVIEW

This Court reviews de novo issues of statutory construction, instructional error, sufficiency of the evidence, and calculation of a defendant's Guidelines range. *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (statutory construction); *United States v. Perkins*, 161 F.3d 66, 69 (D.C. Cir. 1998) (jury instructions); *Valdes v. United States*, 475 F.3d 1319, 1322 (D.C. Cir. 2007) (en banc) (sufficiency); *United States v. Turner*, 21 F.4th 862, 865 (D.C. Cir. 2022) (Guidelines calculations). The effect of a pardon is a legal question likewise reviewed de novo. *See, e.g.*, *Lorance v. Commandant, U.S. Disciplinary Barracks*, 13 F.4th 1150, 1152 (10th Cir. 2021); *Hirschberg v. CFTC*, 414 F.3d 679, 682 (7th Cir. 2005).

## ARGUMENT

### I.    The FECA Convictions Are Invalid

The validity of Mr. Benton's FECA convictions turns on whether Roman Vasilenko, a foreign national, had the primary purpose of influencing a federal election. Yet the jury was not instructed to find—and the Government did not prove—that key element. Each defect independently requires setting aside the FECA convictions.

16

**A.**     The Government charged Mr. Benton under FECA with soliciting or causing a "contribution" by a foreign national, and with serving as a conduit for a "contribution" made by a third party.   52 U.S.C. §§ 30121, 30122.  For each charge, the Government's theory was that Mr. Benton facilitated a contribution from a Russian national, Roman Vasilenko, to the Trump campaign.  Because the Government alleged that Vasilenko (not Mr. Benton) made the contribution, FECA required the Government to prove two elements beyond a reasonable doubt: (1) that Vasilenko had the purpose of influencing a federal election; and (2) that influencing a federal election was Vasilenko's *primary* purpose.

Each element flows from FECA's text.  The FECA provisions under which Mr. Benton was charged involve "contribution[s]" "ma[d]e" by a foreign national or by a third party through a conduit.  *See* 52 U.S.C. § 30121(a)(1)(A) ("[i]t shall be unlawful for … a foreign national … to make … a contribution"); *id.* § 30122 ("[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution").  FECA, in turn, defines a "contribution" as a payment "made by any person for the purpose of influencing any election for Federal office."  *Id.* § 30101(8)(A)(i).  Putting those

17

provisions together, a foreign national or third party cannot "make" a "contribution" unless he or she has "the purpose" of influencing a federal election. *Id.* §§ 30121(a)(1)(A), 30101(8)(A)(i). Here, because the Government alleged that Vasilenko made the contribution, it had to prove that Vasilenko intended to influence a federal election.

The Government, moreover, had to prove that influencing a federal election was not just *one* of Vasilenko's purposes but "*the* purpose." The Supreme Court and other courts have held that when a statute refers to "the" purpose for some action, that purpose must have been the action's "dominant" or "primary" purpose. *Mortensen v. United States*, 322 U.S. 369, 374–75 (1944); *United States v. Verners*, 53 F.3d 291, 297 (10th Cir. 1995); *United States v. McCauley*, 983 F.3d 690, 695–98 (4th Cir. 2020); *see also Otis v. Walter*, 24 U.S. (11 Wheat.) 192, 194 (1826) ("We consider the definite article as having been used for a definite purpose").

In *Mortensen*, for example, the Supreme Court reversed two convictions under the Mann Act for the interstate transport of "any woman or girl for the purpose of prostitution or debauchery." 322 U.S. at 373–74. The convictions could not stand, the Court held, because there was no evidence that prostitution or debauchery was "the dominant motive" of

18

the interstate travel. *Id.* at 374. The Tenth Circuit similarly vacated a jury verdict finding a woman guilty of using her home "for the purpose" of making drugs when the evidence showed that "her primary purpose in maintaining the house was as a home for herself and her two daughters." *Verners*, 53 F.3d at 297.

The Fourth Circuit adopted the same approach in a case involving a statute criminalizing the exploitation of minors "for the purpose of producing any visual depiction" of sexually explicit conduct. *United States v. McCauley*, 983 F.3d 690, 695–98 (4th Cir. 2020) (emphasis omitted). The "fundamental difference between the definite and indefinite article," the court explained, "is whether the accused's alleged purpose carries some predominant weight, as required by the plain statutory language, or … was one among many, potentially much more significant purposes." *Id.* at 695. Because the district court "did not explain to the jury that it must find some predominance of purpose" and allowed a conviction based on a "merely incidental" purpose, the court vacated the conviction. *Id.* at 695, 697.

FECA's use of the definite article—"*the* purpose"—likewise requires a showing of primary purpose. The issue rarely arises under FECA

19

because "[f]unds provided to a candidate or political party or campaign committee" generally do have the primary purpose of influencing a federal election. *Buckley v. Valeo*, 424 U.S. 1, 24 n.24 (1976) (per curiam). But that general rule does not relieve the government of its burden of proving in each criminal prosecution that a payment to a campaign *in fact* was made for the primary purpose of influencing a federal election. *See In re Winship*, 397 U.S. 358, 364 (1970). Holding the government to that burden is critical because FECA "operate[s] in an area of the most fundamental First Amendment activities," and a "violation of its terms carries criminal penalties" that "may deter those who seek to exercise protected First Amendment rights." *Buckley*, 424 U.S. at 14, 76–77.

**B.**    The jury instructions in this case did not require the jury to find that Vasilenko had *any* purpose to influence a federal election, let alone a primary purpose. Instead, the instructions (and the Government) misled the jury into thinking that Mr. Benton's purpose was dispositive, neutering his central defense. That error violated the Sixth Amendment and requires setting aside the FECA convictions. *See Neder v. United States*, 527 U.S. 1, 12 (1999) ("[A]n improper instruction on an element of the offense violates the Sixth Amendment's jury trial guarantee.").

20

**1.**    Jury instructions must "accurately state the governing law and provide the jury with sufficient understanding of the issues and applicable standards." *United States v. DeFries*, 129 F.3d 1293, 1304 (D.C. Cir. 1997) (per curiam).  An instruction fails to do so when it "may have confused or misled the jury." *United States v. Rawlings*, 73 F.3d 1145, 1149 (D.C. Cir. 1996) (reversing conviction); *see also, e.g.*, *McCauley*, 983 F.3d at 694 (vacating conviction because instructions did not "adequately infor[m] the jury of the controlling legal principles without misleading or confusing the jury"); *United States v. Smith*, 561 F.3d 934, 938 (9th Cir. 2009) (en banc) (vacating conviction based on "a reasonable likelihood the trial judge's instructions misled the jury" (quotation marks omitted)); *United States v. Fawley*, 137 F.3d 458, 471 (7th Cir. 1998) (similar; reversing conviction).

Here, the jury instructions were inaccurate—and at a minimum highly misleading—because they omitted key elements of the offenses. The district court never instructed the jury to make a finding about Vasilenko's purpose, much less to find that his *primary* purpose was to influence a federal election.  Instead, reciting the statutory definition of "contribution," the district court repeatedly instructed the jury that an

21

unlawful contribution occurred if "*any person*" made a payment "for the purpose of influencing any election for federal office." JA__–__, __, __[11/14/22.PM.Tr.70–71,77,80] (emphasis added). That parroting of only one relevant portion of the statutory text failed to tell the jury *whose* purpose mattered and "that it must find some predominance of purpose." *McCauley*, 983 F.3d at 697 (holding jury instruction erroneous on this basis). It also misleadingly suggested that the jury could convict if anyone—including Mr. Benton—had the requisite purpose.

The Government has all but conceded that the instructions here were misleading. It admitted post-trial that "[u]nder the case law and the plain language of the statutes, *it is unclear* whether Vasilenko, the Defendant, or both had to have the purpose of influencing the election." JA__–__ n.3[Dkt.65.at.5-6.n.3] (emphasis added). And it did so despite earlier taking the position that only Mr. Benton's purpose mattered under the statute. *See* JA__–__[9/23/22.Tr.14:4-15:2] (acknowledging its argument was "that the Defendant was trying to influence the election through this contribution"). If FECA's language is unclear *to the Government*, then that language could not possibly have "provide[d] the jury

with sufficient understanding of the issues and applicable standards." *DeFries*, 129 F.3d at 1304.

**2.**    Instructional errors are subject to harmless-error review. *See Neder*, 527 U.S. at 7–15.  With errors of constitutional magnitude, reversal is required unless "the government shows 'beyond a reasonable doubt that the error complained of did not contribute to the verdict.'" *United States v. Wilson*, 240 F.3d 39, 44 (D.C. Cir. 2001) (quoting *Neder*, 527 U.S. at 15).  The Government cannot make that showing if "the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Neder*, 527 U.S. at 19; *see also, e.g.*, *United States v. Takhalov*, 827 F.3d 1307, 1320 (11th Cir. 2016) (same); *United States v. Barbosa*, 271 F.3d 438, 459 (3d Cir. 2001) (same).

The Government cannot show that the error was harmless here.  As discussed in more detail below, *infra* 25–30, the Government offered no evidence *at all* that Vasilenko's primary purpose was to influence a federal election.  And there was ample evidence that Vasilenko's overriding aim was to obtain a picture with a celebrity in order to promote his business interests abroad.  It is undisputed, for example, that Vasilenko did not ask to meet a politician and that his initial choices for celebrities to

23

meet included neither Donald Trump nor any other person in political office or running for office.  JA__[Dkt.64-1.at.2].  That alone could "rationally lead to a contrary finding with respect to the omitted element." *Neder*, 527 U.S. at 19.

Vasilenko's purpose, moreover, was the centerpiece of Mr. Benton's defense.  Trial counsel's lead argument in his opening statement was that "this case is about a picture" and had "nothing to do with the president or the election."  JA__–__[11/10/22.AM.Tr.7:16-8:2]; JA__[*id.*at.7:9-11] ("I will say it a bunch of times:  A picture is worth a thousand words.").  Trial counsel sounded the same theme at closing:  "Because what matters is:  What was the purpose here?  Why did Mr. Vasilenko come here?  To meet a celebrity, get an award and make his image better."  JA__[11/15/22.Tr.53:21-23]; JA__[*id.*at.41:14-15] ("He didn't care about the American elections. He wanted to meet a celebrity.").  The erroneous jury instructions cut the legs from under this argument.

The Government compounded the problem by exploiting the misleading instructions during its closing argument.  It repeatedly argued that "*Mr. Benton* had the goal of influencing this election," as if that were the relevant inquiry under FECA.  JA__[11/15/22.Tr.75:12-13] (emphasis

24

added); JA__[*id.*at.16:4-7] ("The Defendant was absolutely soliciting a contribution … for the purpose of influencing the election."); JA__[*id.*at.75:10-11] ("Influence.  He wanted it.  He got it.").  And it urged the jury to convict if it found that influencing an election was merely one of "multiple purposes," rather than the primary purpose that FECA requires.  JA__[*Id.*at.69-70].  As the Government put it in its rebuttal closing argument:  "[P]eople have multiple purposes for almost everything that they do. …  You don't have to choose."  JA__[*Id.*at.70].  The district court rightly understood the Government to have argued that "mixed motives" are sufficient.  JA__–__[Dkt.70.at.5-6].  Doubtless the jury had the same, incorrect understanding of the legal standard.

Because the Government cannot show "beyond a reasonable doubt" that the instructional error "did not contribute to the verdict," *Wilson*, 240 F.3d at 44, Mr. Benton's FECA convictions must, at a minimum, be vacated and remanded for a new trial.

**C.**    In truth, however, Mr. Benton is entitled to outright reversal of his FECA convictions, because the Government failed to prove its case beyond a reasonable doubt under the correct legal standard.  The Government offered no evidence at all that Vasilenko's primary purpose was

to influence a federal election, which is no surprise given the Government's view that it had no obligation to prove Vasilenko's primary purpose. The Government should not get a second bite at the apple.

In reviewing for sufficiency of the evidence, this Court considers the evidence in the light most favorable to the Government and asks whether "any rational trier of fact could have found [the defendant] guilty beyond a reasonable doubt of all the required elements of the crime." *Valdes v. United States*, 475 F.3d 1319, 1322 (D.C. Cir. 2007) (en banc). "This review, although deferential, is not servile." *United States v. Harrison*, 103 F.3d 986, 991 (D.C. Cir. 1997). The Court "must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law." *Id.* "Where the jury can find an essential element of the offense only through speculation, the evidence is insufficient." *United States v. Hillie*, 39 F.4th 674, 692 (D.C. Cir. 2022).

At trial in this case, the Government utterly failed to prove that Vasilenko had a primary purpose of influencing the 2016 presidential election. As the district court acknowledged, it was "difficult to prove" that Vasilenko had *any* purpose of influencing a federal election because Vasilenko "did not testify" at trial. JA__[Dkt.70.at.5]. The Government's

main witness, an FBI agent, admitted that the FBI never even interviewed Vasilenko.  JA__–__[11/10/22.PM.Tr.123:17-124:12].  Nor did the Government introduce a single written statement by Vasilenko; it instead relied on a handful of emails purportedly written by Vasilenko's translator, who also did not testify.  As a result of this evidentiary vacuum, the district court recognized that it was a "close" and "interesting" question whether the Government had offered sufficient evidence to establish even "mixed motives."  JA__,  __[11/14/22.AM.Tr.140:13-16;Dkt.70.at.6].

As already discussed, however, FECA required the Government to prove more than mere mixed motives.  The Government had to prove that Vasilenko's purpose of influencing a federal election was his *primary* purpose—that is, that it had "predominant weight" and was more than "merely incidental."  *McCauley*, 983 F.3d at 695.  The Government never attempted to make that showing because it believed it did not need to do so.  The Government argued to the district court during trial that "[a]s long as [influencing an election] was *a purpose* of this contribution, that's sufficient."  JA__[11/14/22.PM.Tr.46:21-23] (emphasis added).

Unsurprisingly then, the Government's limited circumstantial evidence fell woefully short.  Indeed, the evidence compels the conclusion that Vasilenko's overriding purpose was to obtain a photograph with a celebrity in America to promote his business ventures abroad.  It is undisputed that Vasilenko initially had no interest in American politics.  He wanted to obtain a photograph with any celebrity in the United States in order to promote his business in Russia.  *See* JA__–__[Dkt.65.at.5-6].  The initial list of eleven celebrities that Doug Wead sent to Vasilenko included neither Donald Trump nor anyone in political office or running for office.  JA__[Dkt.64-1.at.2].  And even though Wead offered to introduce Vasilenko to "[a]ny one else he names," Vasilenko selected four individuals from Wead's list.  *Id.*

The Government nonetheless argued that Vasilenko's initial, apolitical purpose "change[d]" into multiple "[p]urposes" once Wead suggested Donald Trump as an alternative celebrity in September 2016.  JA__[Dkt.65.at.6].  It pointed to the facts that Vasilenko (through his translator) acknowledged making a "donat[ion]" to get a photo with Trump; that he attended a Trump campaign event in order to obtain the photo; that after the event, he was very interested in obtaining the photo;

28

and that he used the photo to promote his business in Russia. JA__–__[Dkt.70.at.5-6].

But that circumstantial evidence establishes (at most) the Government's legally erroneous theory that the FECA charges can be sustained if influencing a federal election was one of Vasilenko's "multiple purposes." JA__[11/15/22.Tr.69-70]; *see also* JA__[Dkt.70.at.6]. It does not remotely support a rational, non-speculative inference that helping Donald Trump win the 2016 election was *more* important to Vasilenko than obtaining a photograph with Trump to promote Vasilenko's business ventures abroad.

To the contrary, the Government's evidence showed that after the campaign event and leading up to the November election, Vasilenko's translator repeatedly emailed Doug Wead asking about the photo, not Trump's electoral prospects:

- October 2 email: "Yes, it would be nice to have [the photos]. Roman Vasilenko is getting a bit impatient." JA__[11/10/22.PM.Tr.59:11-14].

- October 24 email: "Roman Vasilenko has asked me to find out if we'll ever get pictures with Mr. Trump." JA__[*Id.*at.62:2-6].

- October 26 email: "I am afraid Roman will shred me into little pieces because of this picture with Trump." JA__[*Id.*at.65:18-21].

Trump's eventual victory might have happened to make Vasilenko's photograph more notable, but that does not establish a contemporaneous primary purpose of influencing an election.

In short, the Government offered no evidence that Vasilenko's payment to Mr. Benton was anything other than a means of obtaining a photo with a celebrity. That evidentiary void on a critical element of the offenses requires reversal of Mr. Benton's FECA convictions.

## II. The District Court Erred In Admitting A Prior Conviction Pardoned On Grounds Of Innocence And In Relying On The Conviction At Sentencing

Mr. Benton also is entitled to a new trial—or at a minimum a re-sentencing—untainted by Mr. Benton's pardoned conviction. In 2016, Mr. Benton was convicted of causing the submission of false reports to the FEC while working on Ron Paul's presidential campaign. Those reports improperly coded expenses paid for an Iowa state senator's endorsement and media appearances. In 2020, President Trump unconditionally pardoned Mr. Benton for that conviction on the ground that Mr. Benton was innocent because the law was unclear as applied to him. The

30

Government nonetheless sought to introduce that pardoned conviction at trial as substantive evidence, and the district court erroneously permitted it, inflicting acute prejudice on Mr. Benton.  The district court then compounded the error by relying on the conviction to prolong Mr. Benton's sentence.

**A.**    Convictions that are pardoned based on the defendant's innocence cannot be admitted against the defendant in a subsequent criminal case.  Federal Rule of Evidence 609 makes that clear when it comes to impeachment.  *See* Fed. R. Evid. 609(c)(2) (pardoned conviction inadmissible for impeachment if "based on a finding of innocence").  But that rule is driven by a deeper logic with no necessary linkage to impeachment.

As the official commentary to Rule 609 explains, "[p]ardons based on innocence have the effect, of course, of nullifying the conviction *ab initio*."  Fed. R. Evid. 609(c) advisory committee's note on proposed rules.  That is because an innocence-based pardon is a final determination by the President, binding on Congress and courts, that the conduct underlying the conviction is, and always was, lawful—and thus that the conviction is, and always was, a nullity.  *See* Henry Weihofen, *The Effect of a Pardon*, 88 U. Pa. L. Rev. 177, 192–93 (1939) (defendant pardoned for

31

innocence "has been found innocent by an official constitutionally empowered to make such a decision, and he should be held to be innocent for all purposes"); *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147–48 (1871) ("the legislature cannot change the effect of such a pardon any more than the executive can change a law"); *cf. Lorance*, 13 F.4th at 1160–61.

No one doubts that proposition when a *court* vacates a conviction "for an act that the law does not make criminal." *Ingber v. Enzor*, 841 F.2d 450, 454 (2d Cir. 1988) (citing *United States v. Johnson*, 457 U.S. 537, 550 (1982)). Vacatur of that kind renders the prior conviction "void *ab initio*" because the "defendants' conduct had never been, even at the time that they were convicted, a violation of" the law. *Schwartz v. United States*, 976 F.2d 213, 216 (4th Cir. 1992). Innocence-based pardons are merely a different avenue to the same result. Indeed, historically pardons often provided "the *only* means by which one could challenge his conviction on the ground of innocence." *Herrera v. Collins*, 506 U.S. 390, 412 (1993) (emphasis added).

The voiding effect of an innocence-based pardon makes a conviction pardoned on that basis inadmissible under Rule 404. Rule 404(b) allows prosecutors to introduce a prior "crime"—that is, a prior conviction—as

32

substantive evidence for specific enumerated purposes, including to prove "identity" or "knowledge." That's what the prosecution did here. But when a conviction has been pardoned on innocence grounds, there is no prior "crime" at all. The pardon voids the conviction because the President has conclusively determined that the conviction rested on conduct that the law does not make criminal. *Cf. United States v. Munoz-Gonzalez*, 812 F.3d 439, 442 (5th Cir. 2016) ("[A] pardon granted for reasons *other than* proof of innocence does not vitiate the defendant's prior crimes or convictions" (emphasis added)).

**B.** Mr. Benton's 2016 conviction was inadmissible at his trial because it was pardoned on the basis of Mr. Benton's innocence. The White House press release accompanying Mr. Benton's pardon explained that Mr. Benton was being pardoned because "the reporting law violated was unclear and not well established at the time," "[a]ccording to Mr. Goodman" (the former FEC Chairman). JA__–__[Dkt.32-1.at.9-10].

If the law was "unclear and not well established" as applied to Mr. Benton's conduct, then by definition Mr. Benton did not receive constitutionally required "fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also FCC v. Fox Television Stations,*

33

*Inc.*, 567 U.S. 239, 253 (2012).  That makes Mr. Benton innocent twice over—both because a "vague law is no law at all," *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019), and because Mr. Benton could not have "knowingly" or "willfully" violated unclear obligations, as the relevant statutes required for a conviction.

The district court recognized the force of this argument, noting that if "there was no willing violation," then Mr. Benton "[was] innocent" of the 2016 offense.  JA__[9/23/22.Tr.20:5-6].  And the district court accepted the Government's concession that Mr. Benton's pardon must be interpreted in light of the White House press release.  JA__, __[*Id.*at.19:19-25,54:21-25].  Yet the district court nonetheless elected to admit Mr. Benton's pardoned conviction on the grounds: (1) that the White House press release indicating Mr. Benton's innocence supposedly was not attributable to the President; and (2) that Mr. Benton's pardon did "not really relate to the actual crimes" for which he was convicted in 2016.  JA__, __[*Id.*at.54:21-25,55:11-23].  Neither rationale withstands scrutiny.

**1.**    The district court believed that the White House press release was not attributable to the President because it was "just passing on

what a former chairman of the FEC," *i.e.*, Chairman Goodman, happened to think about Mr. Benton's conviction.  JA__[9/23/22.Tr.55:16-17].  But that misreads the document.  The press release explains that Chairman Goodman *sponsored* Mr. Benton's pardon on the ground that the reporting requirement was unclear, JA__–__[Dkt.32-1.at.9-10]—not that he was merely offering idle post-hoc commentary.  Chairman Goodman's statement, in other words, explains *why* Mr. Benton was pardoned and what persuaded the President to take action.  The Government's reading, by contrast, makes the press release superfluous and the President's action a mystery.

**2.**    The district court also concluded that Mr. Benton's pardon "does not really relate to the actual crimes with which" he was charged in Iowa.  JA__[9/23/22.Tr.55:20-21].  The district court apparently was channeling the Government's argument that even if the relevant reporting requirement was unclear in certain respects, it wasn't unclear with respect to the conduct for which Mr. Benton was convicted.  JA__[*Id.*at.17:2-15].

The problem with this view is that the President directly repudiated it in pardoning Mr. Benton—on the very ground that Mr. Benton

35

had previously asserted as a key defense. Mr. Benton contended in the Iowa proceeding that "the reporting requirements [were] so vague or confusing" that they were unenforceable as to his own conduct, and thus that he was innocent by operation of the Constitution's fair-notice requirement. *United States v. Benton*, 890 F.3d 697, 710 (8th Cir. 2018). Although the Eighth Circuit rejected Mr. Benton's argument, *id.* at 715, the President accepted it, reasoning that Mr. Benton's legal obligations were "unclear and not well established," JA__–__ [Dkt.32-1.at.9-10].

Whether federal prosecutors now think the President was reasonable or justified in reaching that conclusion is irrelevant. What matters is that the President conclusively disagreed with them and implemented his judgment through a presidential pardon. That presidential judgment must be respected. *See Klein*, 80 U.S. (13 Wall.) at 147–48.

**C.**   The erroneous introduction of Mr. Benton's prior conviction requires a new trial because it "had substantial and injurious … influence" in swaying the jurors to convict. *United States v. Johnson*, 231 F.3d 43, 47 (D.C. Cir. 2000). This Court's precedents have long recognized that the prejudice inflicted by the improper introduction of a prior conviction is "well-nigh inescapable." *Carter*, 482 F.2d at 740. That is

36

particularly so here, where the jury received erroneous instructions about whose "purpose" mattered, and the evidence of the "purpose" that did matter—Vasilenko's—was deficient. *See supra* 25–30. Even when the trial evidence is "ambiguous," "a relatively minor error requires reversal." *United States v. Smart*, 98 F.3d 1379, 1391 (D.C. Cir. 1996). All the more so when the evidence is nonexistent and the error is fundamental. *Cf.* Charles T. McCormick, *Evidence* 327 (1954) (danger of unfair prejudice "is at its highest when character is shown by other criminal acts"). This error entitles Mr. Benton to a new trial on all counts.

**D.** At a minimum, the district court's reliance on Mr. Benton's pardoned conviction requires resentencing Mr. Benton. The district court explained at sentencing that it likely would have given Mr. Benton a noncustodial sentence "but for" his prior conviction, which the court should have treated as void. JA__–__[2/17/23.Tr.46:25-47:2]. Compounding that error, the district court adopted a presentence report that assigned Mr. Benton three criminal-history points in light of his prior conviction and sentence, resulting in a criminal history category of II and a Guidelines range of 18 to 24 months. JA__, __[*Id.*at.7,9]. Under the Sentencing Guidelines, however, convictions that are "expunged"—including

37

convictions pardoned based on "innocence or errors of law"—are "not counted" when computing criminal history.  U.S.S.G. § 4A1.2(j) & n.10; *see also United States v. McDonald*, 991 F.2d 866, 871 (D.C. Cir. 1993); *Mateo v. United States*, 398 F.3d 126, 133 (1st Cir. 2005).

As already explained, Mr. Benton's prior conviction was pardoned based on his innocence—and certainly based on the President's correction of "errors of law" in the Iowa proceedings.  The conviction therefore should have been excluded from Mr. Benton's Guidelines calculations, which would have resulted in zero criminal-history points, a criminal-history category of I, and a Guidelines range of 15 to 21 months.  U.S.S.G. Ch. 5, Pt. A.  Under new and retroactively applicable amendments to the Guidelines, moreover, Mr. Benton would be a "zero-point offender" entitled to a two-point reduction of his offense level (from 14 to 12).[2]  That would further reduce Mr. Benton's Guidelines range to 10 to 16 months.

---

[2] *See* U.S. Sentencing Comm'n, *Amendments to the Sentencing Guidelines* 78–80 (April 27, 2023), https://tinyurl.com/45tc24wc (establishing zero-point offender category); U.S. Sentencing Comm'n, *Amendment to the Sentencing Guidelines* (Aug. 31, 2023), https://tinyurl.com/43swsbbe (making the zero-point offender category retroactive).  These amendments will become effective on November 1, 2023 absent congressional action to the contrary.

Mr. Benton therefore is entitled to a resentencing under a reduced Guide-lines range. *See Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1907 (2018).

## III.  The District Court's Erroneous "Limiting Instruction" Aggravated The Prejudice

Mr. Benton is independently entitled to a new trial on all counts because of the erroneous "limiting instruction" the district court used for Mr. Benton's prior conviction.  That instruction informed jurors that the prior conviction could be used to establish Mr. Benton's supposed modus operandi as a serial form falsifier—even though his identity as the individual who made the relevant communications was never in dispute.  As the district court explained to the jury:

> If you conclude that the crimes in th[e] prior conviction are so similar to the charged offenses that it is likely that the same person committed both of them, then you may use this evidence in determining whether the Government has proved beyond a reasonable doubt that Mr. Benton is the person who committed the election-related crimes charged in this indictment.

JA__[11/14/22.AM.Tr.128:15-21].

The Government then exploited this instruction to the hilt in closing.  It told jurors that the prior conviction could "help you identify" Mr. Benton, establish "[h]is MO" (modus operandi), and demonstrate "how he

39

commits his crimes," making the prior conviction "indicative of his guilt." JA__[11/15/22.Tr.82:17-21]. Together, then, the district court and Government told jurors that they could convict Mr. Benton if they believed an undisputed and obvious truism: that Mr. Benton is "the same person" previously convicted in 2016. JA__[11/14/22.AM.Tr.128:15-21].

**A.** That directive misstated the law. The purpose of identity and modus operandi evidence is to counter a "mistaken identity" defense. When the defendant claims that someone else perpetrated the crime at issue and *disputes* his involvement, unusual prior offenses strikingly similar to the later offense can suggest that the defendant also committed the later offense. In other words, when the defendant commits a crime "so unusual and distinctive as to be like a signature," a similar, prior crime may be used to establish the defendant's modus operandi, and thus his identity. *United States v. Crowder*, 87 F.3d 1405, 1408, 1413 (D.C. Cir. 1996) (en banc), *vacated on other grounds*, 519 U.S. 1087 (1997).

In this case, however, Mr. Benton's identity was *undisputed* from the outset. And it "is well settled that, where identity is *not* in issue, it is improper to admit evidence of other crimes on the theory of proving identity." *Lovely v. United States*, 169 F.2d 386, 391 (4th Cir. 1948)

40

(emphasis added); *see also Chavez v. City of Albuquerque*, 402 F.3d 1039, 1046 (10th Cir. 2005) ("[P]roof of a 'modus operandi' is only relevant when there is an issue regarding the defendant's identity."); *United States v. Johnson*, 27 F.3d 1186, 1194 (6th Cir. 1994) (modus operandi jury instruction "mistaken" when "there was no dispute about the identity of the perpetrator" (emphasis omitted)); 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:36 (4th ed. 2013) (when identity is not in dispute, "the need to use other crimes to prove identity by showing *modus operandi* is reduced to virtually nothing, and this avenue of admissibility should be all but foreclosed").

Where, as here, the defendant does not claim mistaken identity and his "defense rests on other grounds," admitting a prior conviction to establish the defendant's "identity" amounts to bare propensity evidence and seriously prejudices the defendant. 1 Mueller & Kirkpatrick, *Federal Evidence* § 4:36; *see also United States v. Davis*, 547 F.3d 520, 527–29 (6th Cir. 2008) ("modus operandi" theory of admissibility not available where identity was undisputed).

**B.**     Tellingly, the Government thus far has not even attempted to defend the district court's instruction. Instead, it has "assumed" the

41

instruction was erroneous and has asserted: (1) that Mr. Benton's argument is unpreserved, and therefore reviewable for plain error, and (2) that other instructions from the district court mitigated the harm from the erroneous "identity" instruction. Gov't Opp'n to Mot. for Release Pending Appeal at 20–22 & n.6, Doc. 2005080 (June 26, 2023). Each of these arguments fails.

**1.** The Government is wrong that Mr. Benton failed to preserve his objection to the district court's instruction. Mr. Benton repeatedly objected before trial to introduction of the prior conviction on Rule 404(b) grounds, arguing that the prior conviction lacked "the same hallmarks" as the instant offense, had little relevance "to any exceptions under Rule 404(b)," and was "pure propensity evidence." JA__, __[9/23/22.Tr.46:20-22;Dkt.35.at.3]. The district court conclusively rejected those arguments, ruling that the prior conviction could be used to establish knowledge, willfulness, and modus operandi. JA__[9/23/22.Tr.49:2-16].

Mr. Benton did not need to object *again* once the district court instructed the jury pursuant to its pretrial ruling. This Court has held that where, as here, the district court makes an "unconditional and final … pretrial ruling" on a disputed issue, the defendant has no "obligation to

42

reiterate his … concerns at the time when the jury [i]s instructed." *United States v. Wilson*, 26 F.3d 142, 159 (D.C. Cir. 1994); *see also United States v. Tate*, 630 F.3d 194, 197 (D.C. Cir. 2011) (defendant need not "clutter the proceedings with needless objections after the district court has ruled"). Plain-error review therefore is inapplicable here.

2.    The Government also cannot show that this error was harmless. As this Court has recognized, the bar on propensity evidence is rooted in "the presumption of innocence" itself and the principle that the "defendant must be tried for what he did, not for who he is." *United States v. Daniels*, 770 F.2d 1111, 1116 (D.C. Cir. 1985). The district court's instruction disregarded that principle, informing the jury that it could convict if Mr. Benton was "the same person" convicted before. And the Government seized on the instruction in closing, calling the prior conviction "indicative of [Mr. Benton's] guilt." JA__[11/15/22.Tr.82:17-21].

"[T]he prior convictio[n]" therefore was used "as more than evidence" of supposed identity; it was instead "used to suggest guilt." *United States v. Henry*, 528 F.2d 661, 667 (D.C. Cir. 1976). In a case with evidence as thin as it was here on key elements, the Government cannot meet its burden to establish that the error had no "substantial and

43

injurious … influence" on the verdict. *Johnson*, 231 F.3d at 47; *Smart*, 98 F.3d at 1391. Indeed, the error only reinforces the harm the district court inflicted by erroneously admitting Mr. Benton's pardoned offense. *See, e.g.*, *United States v. Lampkin*, 159 F.3d 607, 613 (D.C. Cir. 1998) (erroneous admission of evidence combined with erroneous instruction mandated reversal of convictions).

It is of no moment that the district court offered a generic bad-acts instruction telling the jury that it couldn't convict Mr. Benton solely because he "has a bad character or … a criminal personality." JA__[11/14/22.PM.Tr.68:24-25]. The district court *also* told the jury that if Mr. Benton was "the same person" who committed the Iowa offenses, it would help "prove beyond a reasonable doubt" that he was guilty of the instant offense, too. And "[w]here two instructions conflict, a reviewing court cannot presume that the jury followed the correct one." *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir. 1994) (citing *Francis v. Franklin*, 471 U.S. 307, 322 (1985)). Mr. Benton is entitled to a new trial on all counts based on this instructional error alone. *See Henry*, 528 F.2d at 667 (conviction reversed where "prior convictions were used to suggest guilt").

44

## IV. FECA's Election-Specific False Reporting Framework Precludes Liability Under Sarbanes-Oxley

Mr. Benton's Sarbanes-Oxley convictions also cannot stand because the general false-records provision under which Mr. Benton was convicted, 18 U.S.C. § 1519, does not apply to his charged conduct of causing the submission of false reports to the FEC.  Instead, under age-old rules of statutory construction, FECA's specific, comprehensive, and First Amendment-sensitive enforcement scheme provides the exclusive means for punishing false reports to the FEC.  The Government cannot use Section 1519 to end run FECA's substantive and procedural guardrails.

A.    Enacted in 1971, FECA was this country's first "intricate statutory scheme" designed to "apply broadly to all phases of and all participants in the election process." *Buckley*, 424 U.S. at 12–13.  Because it "operate[s] in an area of the most fundamental First Amendment activities," *id.* at 14, Congress crafted and has repeatedly tailored FECA's provisions "with first amendment concerns in plain view," *Galliano v. U.S. Postal Serv.*, 836 F.2d 1362, 1368 (D.C. Cir. 1988).

FECA's enforcement provisions are no exception.  Although "originally the Federal campaign laws were enforced solely through the criminal law," concerns about over-criminalization in this sensitive area

45

spurred Congress to "plac[e] its reliance on civil enforcement, except as to substantial violations committed with a specific wrongful intent." H.R. Rep. No. 94-917, at 3 (1976). Thus, for the conduct at issue here—the false "reporting of any contribution" to the FEC—Congress has limited criminal liability to "willful" violations that involve $2,000 or more per year, and has authorized a maximum of five years' imprisonment for offenses involving $25,000 or more. 52 U.S.C. § 30109(d). For offenses involving less than $2,000 or lacking heightened intent, Congress gave the FEC "exclusive" civil jurisdiction. *Id.* §§ 30107(e), 30109(a).

In addition to carefully cabining criminal liability, FECA "includes a procedural" protection: the conciliation process. *Galliano*, 836 F.2d at 1370. Congress required that "informal conciliation efforts between an alleged FECA violator and the FEC occur before any formal civil enforcement action is taken." *Id.*; 52 U.S.C. § 30109(a)(4)(A)(i). Any resulting conciliation agreement may be used by a defendant criminally charged for the same conduct under FECA in order to "evidence their lack of knowledge or intent." 52 U.S.C. § 30109(d)(2). It also "shall" be taken into account at sentencing. *Id.* § 30109(d)(3).

46

**B.**    FECA's specific, comprehensive enforcement scheme controls over Section 1519's general terms as applied to false reporting to the FEC.  "It is a commonplace of statutory construction that the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (brackets and quotation marks omitted).  When specific and general statutes have overlapping applications, the Supreme Court has long held that the "more specific statute will be given precedence over a more general one, regardless of their temporal sequence."  *Busic*, 446 U.S. at 406.  Put another way, "a precisely drawn, detailed statute pre-empts more general remedies."  *EC Term of Years Tr. v. United States*, 550 U.S. 429, 433 (2007).

For more than a century, the Supreme Court, this Court, and other courts have applied this principle in "a variety of contexts," including in criminal and FECA cases.  *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834 (1976) (civil statutes); *Busic*, 446 U.S. at 406 (criminal statutes); *Galliano*, 836 F.2d at 1368 (FECA); *see also, e.g.*, *RadLAX Gateway Hotel*, 566 U.S. at 645; *EC Term of Years Tr.*, 550 U.S. at 433; *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 284–85 (1983); *Simpson v. United States*, 435 U.S. 6, 15 (1978); *Preiser v. Rodriguez*, 411

47

U.S. 475, 489 (1973); *United States v. Demko*, 385 U.S. 149, 154 (1966); *Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 228–29 (1957); *United States v. Chase*, 135 U.S. 255, 260 (1890); *Patten v. District of Columbia*, 9 F.4th 921, 926 (D.C. Cir. 2021); *United States v. LaPorta*, 46 F.3d 152, 156 (2d Cir. 1994).

Here, there is no dispute that Section 1519 and FECA overlap in their application to false reporting to the FEC. And FECA clearly is the more specific statute as applied to that conduct, as it prohibits willful "violation[s] of any provision of this Act which involves the … *reporting* of any contribution" to the FEC. 52 U.S.C. § 30109(d)(1)(A) (emphasis added). Section 1519, in contrast, is a "corporate document-shredding" proscription enacted as part of Sarbanes-Oxley. *Yates v. United States*, 574 U.S. 528, 536 (2015) (plurality op.). It imposes criminal penalties on any person who "knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in *any* record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of *any* matter within the jurisdiction of *any* department or agency of the United States." 18 U.S.C. § 1519 (emphases added).

48

The yawning gap between the specificity of FECA's language and the generality of Section 1519's alone compels the conclusion that FECA must be "given precedence." *Busic*, 446 U.S. at 406.

**C.**    Context confirms the text. Courts applying the specific-general rule have recognized that the rule applies with special force: (1) when criminal statutes are involved; (2) when the specific statute creates a comprehensive remedial scheme; and (3) when the general statute would effectively nullify the specific statute where they overlap. Here, the presence of *all* of these factors makes this a heartland case for applying the specific-general rule.

**1.**    The specific-general rule has "special cogency" in cases involving criminal statutes. *Simpson v. United States*, 435 U.S. 6, 15 (1978). In criminal cases, the rule "is a corollary of the rule of lenity, an outgrowth of our reluctance to increase or multiply punishments absent a clear and definite legislative directive." *Id.* at 15–16. Those fair-notice concerns are heightened when the general criminal statute is enacted *after* the specific statute: "Where offenses have been specifically defined by Congress and the public has been guided by such definitions for many years, it is not natural for Congress by general legislation to amend such

49

definitions or the punishments prescribed for such offenses, without making clear its intent to do so." *Williams v. United States*, 327 U.S. 711, 718 (1946).

Relying on these principles, the Supreme Court in *Simpson* and *Busic* held that the Government could not use 18 U.S.C. § 924(c)'s enhanced criminal penalties, which apply to felons in possession of a firearm, when the statute of conviction contains its own enhanced penalties for using a dangerous weapon. *Busic*, 446 U.S. at 399–400, 406–07; *Simpson*, 435 U.S. at 10–16. Allowing the Government to use the later-enacted Section 924(c), the Court reasoned, would "increase the penalty … on an individual" and "impliedly repea[l] *all* pre-existing enhancement provisions" applicable to firearms "based on no more than a guess as to what Congress intended." *Simpson*, 435 U.S. at 15; *Busic*, 446 U.S. at 407.

Other courts similarly have held that specific substantive criminal prohibitions trump more general ones. In *LaPorta*, for example, the Second Circuit held that a statute prohibiting the "destruction of government property by fire" preempted a statute imposing more serious penalties for the use of fire to commit "any felony." 46 F.3d at 155–57. The

court required a "clear and definite" statement from Congress before applying the "harsher" statute, particularly when doing so would "rob [the specific statute] of all practical effect." *Id.* at 156–57; *see also Robinson v. United States*, 142 F.2d 431, 432 (8th Cir. 1944) (statute prohibiting larceny of Post Office property trumps harsher general larceny statute where they overlap).[3]

The same principles apply here. FECA's detailed penalty scheme—which creates a rigid dichotomy between criminal and civil offenses—has been on the books since 1976. Pub. L. No. 94-283, Title I, §§ 105, 109 (May 11, 1976). With "the public" having "been guided by" FECA's terms for decades, it is incumbent upon Congress to "mak[e] clear its intent" to increase punishments for the conduct proscribed by that statute. *Williams*, 327 U.S. at 718. Yet Section 1519, which was enacted almost 30 years after FECA and features drastically increased penalties,

---

[3] To be sure, the Government typically may choose to prosecute under either of two overlapping statutes applying to the same conduct when those statutes are framed at comparable levels of generality. *See United States v. Batchelder*, 442 U.S. 114, 121 (1979). But that principle does not apply where, as here, an earlier-enacted statute governs the conduct at issue with much greater specificity than, and would be effectively nullified by, the later-enacted, more general statute. *See LaPorta*, 46 F.3d at 156.

51

lacks any "clear and definite legislative directive" that it applies to election-related conduct. *Simpson*, 435 U.S. at 15–16. To the contrary, the Supreme Court has recognized that Section 1519 has a "financial-fraud mooring" and has refused to extend it beyond that arena. *Yates*, 574 U.S. at 532 (plurality op.). This Court should not extend it here.

**2.**    The specific-general rule also has "particula[r]" force "where 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *Patten*, 9 F.4th at 926 (quoting *RadLAX Gateway Hotel*, 566 U.S. at 645). The "balance, completeness, and structural integrity" of a statutory scheme indicates that it is meant to be "exclusive" where it applies. *Brown*, 425 U.S. at 832, 834–35.[4] Congress "should not be held to have made exceptions to that system without specific legislation to that effect." *Johansen v. United States*, 343 U.S. 427, 441 (1952).

As already discussed, Congress created just such a comprehensive and exclusive scheme in FECA. Indeed, this Court has recognized that

---

[4] *See also, e.g.*, *Preiser*, 411 U.S. at 489 (federal habeas statute preempts Section 1983 when state prisoners challenge confinement); *Patten*, 9 F.4th at 926 (Randolph-Sheppard Act's "comprehensive" scheme controls over anti-discrimination statutes).

FECA's "comprehensive" and "first-amendment-sensitive" framework is exclusive in its domain in the civil context. *Galliano*, 836 F.2d at 1368, 1370 (FECA preempts certain applications of postal fraud statute, 39 U.S.C. § 3005). That conclusion applies with equal force here. FECA's "balance, completeness, and structural integrity," combined with its "careful blend of administrative and judicial enforcement powers," compels the inference that Congress intended FECA to be "exclusive" in its sphere. *Brown*, 425 U.S. at 832–33, 834–35.

**3.** Finally, application of the specific-general rule is particularly appropriate when resort to a more general statute would "'driv[e] out of currency' a narrowly aimed provision … by permitting 'access to the courts under other, less demanding statutes.'" *EC Term of Years Tr.*, 550 U.S. at 434 (quoting *Brown*, 425 U.S. at 833–34). That can happen when, for example, the specific statute has a shorter statute of limitations than the general statute, *id.* at 435–36; when it "carr[ies] smaller penalties than the general provision," *Robinson*, 142 F.2d at 432; or when it imposes stricter procedural limitations than the general statute, *Preiser*, 411 U.S. at 489. In each of these circumstances, it "would require the suspension of disbelief to ascribe to Congress the design to allow its

53

careful and thorough remedial scheme to be circumvented by artful pleading." *Block*, 461 U.S. at 285.

Here, allowing the Government to prosecute false reports to the FEC under Section 1519—a less demanding *and* more punitive statute— would wreck FECA's comprehensive enforcement scheme. If the Government can prosecute under Section 1519, it could seek up to 20 years in prison for false reports to the FEC, well above FECA's five-year maximum. *Compare* 18 U.S.C. § 1519, *with* 52 U.S.C. § 30109(d)(1)(A)(i). It could seek those outsized criminal penalties for *any* false report to the FEC, even for minor violations that FECA has confined to the FEC's "exclusive" civil jurisdiction. 52 U.S.C. § 30107(e). And it would have no need to satisfy FECA's heightened willfulness requirement, or to account for a defendant's conciliation agreement at trial or sentencing. *Id.* § 30109(d)(1)(D)(2)–(3). Section 1519, in short, would allow the Government to circumvent all of FECA's carefully calibrated guardrails.

That is not a mere academic concern. The Department of Justice's manual for prosecuting federal election offenses has described FECA as "difficult to use in federal criminal prosecutions" in part because it provides for reduced sanctions and "requires that a monetary jurisdictional

floor be satisfied." Craig C. Donsanto, U.S. Department of Justice, *Federal Prosecution of Election Offenses* 75 (5th ed. 1988); *id.* at 78 (FECA is "generally less attractive, and tactically more difficult," than other statutes). The Department thus has recommended that prosecutors "use alternative prosecutive theories to reach FECA crimes wherever possible," *id.* at 75–76, and has repeatedly touted Section 1519 as one of these "alternative prosecutive theories." *See* Richard C. Pilger, U.S. Department of Justice, *Federal Prosecution of Election Offenses* 172, 195–96 (8th ed. 2017); *see also id.* at 5, 14, 149, 167.

This case is proof positive that the Section 1519 "alternative" has become the mainstay when it comes to prosecuting false reports to the FEC. In this case, the Government brought its foreign-contribution and conduit-contribution charges under FECA, yet it spurned FECA when charging Mr. Benton's reporting conduct even though it could have sought FECA's maximum five-year penalty. That the Government resorted to Section 1519 even when FECA is at its most potent shows that FECA's comprehensive scheme for penalizing false reports to the FEC will be reduced to dust if Section 1519 applies to the same conduct.

\*     \*     \*

When a criminal statute is as longstanding, comprehensive, and specific as FECA, the public is entitled to rely on it in organizing its affairs. *Cf. McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("fair warning should be given to the world in language that the common world will understand"). Because Congress has not "ma[de] clear its intent" to "amend … the punishments prescribed" under FECA for submitting false reports to the FEC, the Government may prosecute that conduct *only* under FECA. *Williams*, 327 U.S. at 718. Mr. Benton's Section 1519 convictions for causing false reports to the FEC must be reversed.

## CONCLUSION

Mr. Benton's convictions should be reversed and his sentence vacated. At a minimum, he should be granted a new trial at which the Government is required to present its case, under the correct legal standards, to a properly instructed jury.

56

September 15, 2023                    Respectfully submitted,

                                      _/s/ Matthew D. McGill_____
                                      Matthew D. McGill
                                        *Counsel of Record*
                                      Nick Harper
                                      M. Christian Talley
                                      GIBSON, DUNN & CRUTCHER LLP
                                      1050 Connecticut Avenue, N.W.
                                      Washington, D.C.  20036
                                      (202) 887-3680
                                      mmcgill@gibsondunn.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations. This brief was prepared using a proportionally spaced type (New Century Schoolbook, 14 point). Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), this brief contains 10,627 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

September 15, 2023                Respectfully submitted,

                                   /s/ *Matthew D. McGill*
                                  Matthew D. McGill
                                  GIBSON, DUNN & CRUTCHER LLP
                                  1050 Connecticut Avenue, N.W.
                                  Washington, D.C. 20036
                                  (202) 887-3680
                                  mmcgill@gibsondunn.com

# Addendum

## TABLE OF CONTENTS

**Page**

18 U.S.C. § 1519..............................................................ADD 1

52 U.S.C. § 30101(8)(A) ...................................................ADD 1

52 U.S.C. § 30109(d) ........................................................ADD 1

52 U.S.C. § 30121 .............................................................ADD 3

52 U.S.C. § 30122 .............................................................ADD 4

## 18 U.S.C. § 1519 – Destruction, alteration, or falsification of records in Federal investigations and bankruptcy

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

## 52 U.S.C. § 30101(8)(A) – Definitions

[ … ]

**(8)(A)** The term "contribution" includes—

**(i)** any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or

**(ii)** the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.

[ … ]

## 52 U.S.C. § 30109(d) – Enforcement

[ … ]

**(d)** PENALTIES; DEFENSES; MITIGATION OF OFFENSES

**(1)(A)** Any person who knowingly and willfully commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure—

ADD 1

**(i)**  aggregating $25,000 or more during a calendar year shall be fined under title 18, or imprisoned for not more than 5 years, or both; or

**(ii)**  aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

**(B)**  In the case of a knowing and willful violation of section 30118(b)(3) of this title, the penalties set forth in this subsection shall apply to a violation involving an amount aggregating $250 or more during a calendar year.  Such violation of section 30118(b)(3) of this title may incorporate a violation of section 30119(b), 30122, or 30123 of this title.

**(C)**  In the case of a knowing and willful violation of section 30124 of this title, the penalties set forth in this subsection shall apply without regard to whether the making, receiving, or reporting of a contribution or expenditure of $1,000 or more is involved.

**(D)**  Any person who knowingly and willfully commits a violation of section 30122 of this title involving an amount aggregating more than $10,000 during a calendar year shall be—

**(i)**  imprisoned for not more than 2 years if the amount is less than $25,000 (and subject to imprisonment under subparagraph (A) if the amount is $25,000 or more);

**(ii)**  fined not less than 300 percent of the amount involved in the violation and not more than the greater of—

**(I)**  $50,000; or

**(II)**  1,000 percent of the amount involved in the violation; or

**(iii)**  both imprisoned under clause (i) and fined under clause (ii).

ADD 2

**(2)**  In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of title 26, any defendant may evidence their lack of knowledge or intent to commit the alleged violation by introducing as evidence a conciliation agreement entered into between the defendant and the Commission under subsection (a)(4)(A) which specifically deals with the act or failure to act constituting such violation and which is still in effect.

**(3)**  In any criminal action brought for a violation of any provision of this Act or of chapter 95 or chapter 96 of title 26, the court before which such action is brought shall take into account, in weighing the seriousness of the violation and in considering the appropriateness of the penalty to be imposed if the defendant is found guilty, whether—

> **(A)**  the specific act or failure to act which constitutes the violation for which the action was brought is the subject of a conciliation agreement entered into between the defendant and the Commission under subparagraph (a)(4)(A);

> **(B)**  the conciliation agreement is in effect; and

> **(C)**  the defendant is, with respect to the violation involved, in compliance with the conciliation agreement.

## 52 U.S.C. § 30121 – Contributions and donations by foreign nationals

**(a)** PROHIBITION

It shall be unlawful for—

**(1)**  a foreign national, directly or indirectly, to make—

> **(A)**  a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

ADD 3

**(B)**  a contribution or donation to a committee of a political party; or

**(C)**  an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 30104(f)(3) of this title); or

**(2)**  a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

**(b)  "FOREIGN NATIONAL" DEFINED**

As used in this section, the term "foreign national" means—

**(1)**  a foreign principal, as such term is defined by section 611(b) of title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

**(2)**  an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(20) of title 8.

## 52 U.S.C. § 30122 – Contributions in name of another prohibited

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

ADD 4

## CERTIFICATE OF SERVICE

I hereby certify that, on September 15, 2023, I electronically filed the foregoing brief with the Clerk for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

September 15, 2023                          Respectfully submitted,

                                            _/s/ Matthew D. McGill_
                                            Matthew D. McGill
                                            GIBSON, DUNN & CRUTCHER LLP
                                            1050 Connecticut Avenue, N.W.
                                            Washington, D.C. 20036
                                            (202) 887-3680
                                            mmcgill@gibsondunn.com