ORAL ARGUMENT SCHEDULED FOR FEBRUARY 12, 2024

No. 23-3028

_____

# In the United States Court of Appeals for the District of Columbia Circuit

_____

**UNITED STATES OF AMERICA**,

**Plaintiff-Appellee**,

v.

**JESSE R. BENTON**,

**Defendant-Appellant**.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 1:21-CR-569 (MCFADDEN, J.)

_____

## FINAL APPELLEE'S BRIEF FOR THE UNITED STATES

ROBERT HEBERLE
Deputy Chief

LAUREN CASTALDI
Trial Attorney
Public Integrity Section

MICHELLE WASSERMAN
Assistant United States Attorney
Southern District of California

NICOLE M. ARGENTIERI
Acting Assistant Attorney General

LISA H. MILLER
Deputy Assistant Attorney General

W. CONNOR WINN
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 669-6551
William.Winn@usdoj.gov

**CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Cir. R. 28(a)(1), the undersigned certifies as follows:

### A.    Parties and Amici

All parties, intervenors, and amici appearing in the district court and in this Court are listed in the Opening Brief for Defendant-Appellant Jesse R. Benton.

### B.    Rulings Under Review

References to the rulings at issue appear in the Opening Brief for Defendant-Appellant Jesse R. Benton.

### C.    Related Cases

This case has not previously been before this Court or any other court of appeals.  No related cases are currently pending in this Court or any other court of which counsel is aware.  As Benton notes, he was indicted alongside a coconspirator who has since passed, and that prosecution has abated.

s/ W. Connor Winn

W. CONNOR WINN
U.S. Department of Justice
Criminal Division
Appellate Section

## STATEMENT REGARDING ORAL ARGUMENT

This Court has set oral argument for February 12, 2024.

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES .......i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF AUTHORITIES .......................................................... vi

GLOSSARY ..................................................................... xiv

INTRODUCTION................................................................... 1

JURISDICTIONAL STATEMENT ................................................ 2

ISSUES PRESENTED ............................................................ 2

STATEMENT OF THE CASE .................................................... 3

    I.    Factual Statement ................................................... 3

    II.   Procedural History ................................................. 8

    III.  Rulings Under Review ............................................ 9

SUMMARY OF ARGUMENT .................................................... 9

ARGUMENT ................................................................... 13

    I.    Benton's FECA Convictions Are Sound................................ 13

        A.    Legal Background ......................................... 14

        B.    Factual Background....................................... 16

        C.    The District Court Did Not Plainly Err When Instructing the Jury About FECA Contributions. ......19

            1.    Standard of Review ............................................19

            2.    The FECA Jury Instructions Contained No Plain Error. ......................................................21

3.  Benton Has Not Shown An Effect On Substantial Rights. ...............................32

D.  Benton Has Not Raised a Proper Sufficiency Claim. .....................................................35

II.  The Government Properly Charged Benton Under 18 U.S.C. § 1519. ................................................36

A.  Background ..................................................36

B.  Standard of Review ......................................38

C.  Section 1519 Punishes Benton's Conduct....................38

III. The District Court Committed No Reversible Error as to Benton's Pardoned Convictions. ...........................47

A.  Factual Background ......................................47

B.  Standards of Review ....................................51

C.  Federal Rule of Evidence 404(b)(2) Did Not Plainly Prohibit Using Benton's Prior Pardoned Convictions. ...............................................52

D.  If Not Waived, Benton's Plain-Error Pardon-Related Sentencing Claims Fail. ................................59

IV.  The Rule 404(b) Limiting Instruction Suffered No Plain, Reversible Error. ............................................60

A.  Background ..................................................60

B.  Standard of Review ......................................62

C.  The Rule 404(b) Limiting Instruction Did Not Plainly or Reversibly Mislead the Jury. .......................62

CONCLUSION ...................................................67

iv

CERTIFICATE OF COMPLIANCE.......................................................68

STATUTORY ADDENDUM .........................................................ADD 1

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Awad v. Obama,*
    608 F.3d 1 (D.C. Cir. 2010) .................................................................51

*Buckley v. Valeo,*
    424 U.S. 1 (1976)...................................................... 10, 14, 22, 30-31, 33

*Busic v. United States,*
    446 U.S. 398 (1980)..........................................................................46

*Campaign Legal Ctr. v. FEC,*
    31 F.4th 781 (D.C. Cir. 2022).............................................................14

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..........................................................................31

*Estelle v. McGuire,*
    502 U.S. 62 (1991)............................................................................65

*FEC v. Ted Haley Cong. Comm.,*
    852 F.2d 1111 (9th Cir. 1988)............................................................24

*Hamdan v. Rumsfeld,*
    548 U.S. 557 (2006)..........................................................................58

*Herrera v. Collins,*
    506 U.S. 390 (1993)..........................................................................52

*In re Aiken Cnty,*
    725 F.3d 255 (D.C. Cir. 2013) ...........................................................52

*In re Kellogg Brown & Root, Inc.,*
    756 F.3d 754 (D.C. Cir. 2014) ...........................................................34

*In re North,*
    62 F.3d 1434 (D.C. Cir. 1994) ......................................... 12, 52, 54, 57

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997) ............................................................ 56

*Mortensen v. United States,*
    322 U.S. 369 (1944) ........................................................................... 28

*Nat'l Ass'n of Mfrs. v. Taylor,*
    582 F.3d 1 (D.C. Cir. 2009) ............................................................... 22

*Nelson v. City of Chicago,*
    810 F.3d 1061 (7th Cir. 2016) ............................................................ 63

*Nielsen v. Preap,*
    139 S. Ct. 954 (2019) ......................................................................... 29

*Orloski v. FEC,*
    795 F.2d 156 (D.C. Cir. 1986) ................................................. 21, 23-24

*Posters 'N' Things, Ltd. v. United States,*
    511 U.S. 513 (1994) ........................................................................... 23

*Prisament v. United States,*
    92 Ct. Cl. 434 (1941) ......................................................................... 56

*Richards v. United States,*
    192 F.2d 602 (D.C. Cir. 1951) ................................................. 52-53, 55

*Simpson v. United States,*
    435 U.S. 6 (1978) ............................................................................... 46

*United States v. Banks,*
    514 F.3d 959 (9th Cir. 2008) ..................................................... 27-29, 31

*United States v. Batchelder,*
    442 U.S. 114 (1979) ...................................................................... 11, 42

*United States v. Benton,*
    890 F.3d 697 (8th Cir. 2018) ............................................... 4, 40-41, 47

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ............................................................ 43

*United States v. Bird*,
   79 F.4th 1344 (11th Cir. 2023) ......................................................... 20

*United States v. Burden*,
   934 F.3d 675 (D.C. Cir. 2019) ........................................................... 41

*United States v. Clarke*,
   24 F.3d 257 (D.C. Cir. 1994) ....................................................... 55, 64

*United States v. Coachman*,
   727 F.2d 1293 (D.C. Cir. 1984) ......................................................... 43

*United States v. Computer Scis. Corp.*,
   689 F.2d 1181 (4th Cir. 1982) ..................................................... 43, 46

*United States v. David*,
   96 F.3d 1477 (D.C. Cir. 1996) ........................................................... 51

*United States v. Emmons*,
   8 F.4th 454 (6th Cir. 2021) ............................................................... 40

*United States v. Fischer*,
   64 F.4th 329 (D.C. Cir. 2023) ...................................................... 38, 41

*United States v. Flucas*,
   22 F.4th 1149 (9th Cir. 2022) ........................................................... 27

*United States v. Fraser*,
   448 F.3d 833 (6th Cir. 2006) ....................................................... 65-66

*United States v. Garcia*,
   74 F.4th 1073 (10th Cir. 2023) ......................................................... 28

*United States v. Gonzales*,
   520 U.S. 1 (1997) ....................................................................... 30, 39

*United States v. Hamilton,*
48 F.3d 149 (5th Cir. 1995) ................................................................. 53

*United States v. Henry,*
848 F.3d 1 (1st Cir. 2017) ............................................................. 65-66

*United States v. Hsia,*
176 F.3d 517 (D.C. Cir. 1999) ................................................ 42, 44, 46

*United States v. Jackson,*
805 F.2d 457 (2d Cir. 1986) ........................................................ 42, 46

*United States v. Johnson,*
970 F.2d 907 (D.C. Cir. 1992) ............................................................ 63

*United States v. Jones,*
607 F.2d 269 (9th Cir. 1979) ......................................................... 43-45

*United States v. Kelley,*
981 F.2d 1464 (5th Cir. 1993) ...................................................... 54-55

*United States v. Khatallah,*
41 F.4th 608 (D.C. Cir. 2022) ............................... 3, 20, 32, 36, 59, 64

*United States v. Klein,*
80 U.S. 128 (1871) ............................................................................. 52

*United States v. Kukushkin,*
61 F.4th 327 (2d Cir. 2023) ............................................................... 41

*United States v. LaPorta,*
46 F.3d 152 (2d Cir. 1994) ................................................................ 45

*United States v. Laureys,*
653 F.3d 27 (D.C. Cir. 2011) ............................................................. 20

*United States v. Long,*
328 F.3d 655 (D.C. Cir. 2003) ..................................................... 12, 54

*United States v. Marschall,*
   82 F.4th 774 (9th Cir. 2023) ............................................................ 24

*United States v. McCauley,*
   983 F.3d 690 (4th Cir. 2020) .................................................. 27, 29, 31

*United States v. McGill,*
   815 F.3d 846 (D.C. Cir. 2016) ......................................... 26, 62, 64-66

*United States v. Mohammed,*
   693 F.3d 192 (D.C. Cir. 2012) .................................................... 44-46

*United States v. Moore,*
   703 F.3d 562 (D.C. Cir. 2012) ........................................................ 51

*United States v. Newsom,*
   452 F.3d 593 (6th Cir. 2006) .......................................................... 64

*United States v. Reynoso,*
   38 F.4th 1083 (D.C. Cir. 2022) ...................................... 10, 14, 35-36

*United States v. Rodgers,*
   466 U.S. 475 (1984) ........................................................................ 30

*United States v. Rogers,*
   918 F.2d 207 (D.C. Cir. 1990) .................................................... 54-55

*United States v. Safehouse,*
   985 F.3d 225 (3d Cir. 2021) ........................................................... 27

*United States v. Sampol,*
   636 F.2d 621 (D.C. Cir. 1980) ....................................................... 64

*United States v. Schaffer,*
   240 F.3d 35 (D.C. Cir. 2001) ......................................................... 56

*United States v. Schaffner,*
   715 F.2d 1099 (6th Cir. 1983) ....................................................... 46

*United States v. Scott,*
  979 F.3d 986 (2d Cir. 2020) .............................................................. 39

*United States v. Shetler,*
  665 F.3d 1150 (9th Cir. 2011) .......................................................... 27

*United States v. Singh,*
  979 F.3d 697 (9th Cir. 2020) ........................................................... 15

*United States v. Torres,*
  894 F.3d 305 (D.C. Cir. 2018) .................................................27-28, 32

*United States v. Venable,*
  269 F.3d 1086 (D.C. Cir. 2001) ...................................................... 67

*United States v. Verners,*
  53 F.3d 291 (10th Cir. 1995) .......................................................... 28

*United States v. Verrusio,*
  762 F.3d 1 (D.C. Cir. 2014) ............................................................ 38

*United States v. Wilson,*
  26 F.3d 142 (D.C. Cir. 1994) .......................................................... 62

*Watkins v. Thomas,*
  623 F.2d 387 (5th Cir. 1980) .......................................................... 51

*Woodhull Freedom Found. v. United States,*
  72 F.4th 1286 (D.C. Cir. 2023) ...................................................... 58

*Yates v. United States,*
  574 U.S. 528 (2015) ................................................................. 39, 43

## Statutes

18 U.S.C. § 1001 ............................................................................... 47

18 U.S.C. § 1519 ............................................... 1-3, 10, 36-37, 39, 47

18 U.S.C. § 2 ........................................................... 3, 10, 37, 47

18 U.S.C. § 2251 ................................................................ 27

18 U.S.C. § 2421 ................................................................ 27

18 U.S.C. § 2423 ................................................................ 27

18 U.S.C. § 3231 .................................................................. 2

18 U.S.C. § 3742 .................................................................. 2

2 U.S.C. § 431 (1976) ........................................................ 25

21 U.S.C. § 856 .................................................................. 27

28 U.S.C. § 1291 .................................................................. 2

28 U.S.C. § 2513 ................................................................ 56

52 U.S.C. § 30101 ...................................2, 6, 10, 13, 16, 19, 21, 23, 25, 29

52 U.S.C. § 30104 ........................................ 15, 23, 38, 40, 44, 47

52 U.S.C. § 30106 .............................................................. 40

52 U.S.C. § 30107 ........................................................ 14, 40

52 U.S.C. § 30108 .............................................................. 15

52 U.S.C. § 30109 ................................. 3, 11, 14-15, 31, 38, 40-41, 44, 47

52 U.S.C. § 30111 .............................................................. 40

52 U.S.C. § 30116 .............................................................. 15

52 U.S.C. § 30121 ........................................................ 3, 6, 15

52 U.S.C. § 30122 ................................................... 3, 6, 15-16

**Rules, Regulations, and Sentencing Guidelines**

11 C.F.R. § 100.53 .............................................................. 25

D.C. Cir. R. 28 ...................................................................................i

Fed. R. Evid. 404 .........................................................................2, 53

Fed. R. Evid. 609 .......................................................................53, 55

U.S.S.G. § 4A1.2 (2021) ..................................................................60

## Other Authorities

45 Fed. Reg. 15080 (Mar. 7, 1980) .................................................25

American Heritage Dictionary of the English Language (New College
    ed., 1975) ...................................................................................28

Black's Law Dictionary (5th ed. 1979) ...........................................28

S. Rep. No. 107-146 (2002) ............................................................43

# GLOSSARY

| | |
|---|---|
| **Br.** | Benton's initial Opening Brief |
| **FEC** | Federal Election Commission |
| **FECA** | Federal Election Campaign Act |
| **JA** | Joint Appendix |
| **SJA** | Sealed Supplemental Joint Appendix |

## INTRODUCTION

Jesse Benton is a sophisticated "political operative" who has managed many prominent American political campaigns in his career. But in 2016, he covertly channeled a Russian billionaire's donation to an American presidential campaign and political party. After that fact came to light, a jury convicted Benton of six federal campaign-finance and obstruction-of-justice crimes, and the district court sentenced him to 18 months in prison.

On appeal, Benton seeks to overturn his convictions by rewriting the Federal Election Campaign Act (FECA) and precluding application of an obstruction-of-justice law (18 U.S.C. § 1519) to those who deliberately obstruct the functions of the Federal Election Commission (FEC). Benton also requests a new trial or sentence based on forfeited or barred claims about how the jury and district court considered evidence of his prior campaign-finance convictions, pardoned by the former President.

This Court should affirm Benton's convictions and sentence. The charges against Benton were proper; the evidence at trial amply proved his guilt; and FECA and Section 1519 do not mean what he says.

1

Meanwhile, his belated evidentiary and sentencing claims lack merit and would not have led to a different outcome if made below.

## JURISDICTIONAL STATEMENT

The district court (McFadden, J.) had jurisdiction under 18 U.S.C. § 3231 and entered judgment against Benton on February 17, 2023. JA 442. Benton filed a timely notice of appeal on March 2, 2023. JA 457. This Court has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.    Whether, if the claim is not waived, the district court plainly erred in failing to instruct the jury that a defendant must have the "primary purpose" of influencing an election in order for a monetary donation to constitute a FECA "contribution." 52 U.S.C. § 30101(8)(A)(i).

2.    Whether the government properly charged Benton's obstructive false-reporting conduct under 18 U.S.C. § 1519.

3.    Whether the district court reversibly erred in admitting Benton's prior campaign-finance convictions, pardoned by the President, under Federal Rule of Evidence 404(b).

4.    If not waived, whether the district court reversibly erred at sentencing by not treating these pardoned convictions as *void ab anitio*.

2

5.     Whether the district court delivered a plainly and reversibly erroneous Rule 404(b) limiting instruction.

## STATEMENT OF THE CASE

After a six-day trial, Benton was convicted on one count of soliciting and causing a foreign national's contribution, in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30121 and 18 U.S.C. § 2; one count of permitting another to use his name to make a contribution, in violation of 52 U.S.C. §§ 30109(d)(1)(A)(i), 30122; three counts of causing the creation of false records to impede, obstruct, or influence a governmental matter, in violation of 18 U.S.C. §§ 1519, 2(b); and one count of conspiring to commit these crimes, in violation of 18 U.S.C. § 371.  JA 442-43.  The district court sentenced him to 18 months' imprisonment and two years' supervised release.  JA 444-45.

## I.     Factual Statement[1]

1.     Benton is a longtime "political operative" who has worked on and managed several prominent federal political campaigns.  JA 165-66, 171-72.  During the 2016 election cycle, he worked with a political action

---

[1] The government presents the facts here in the light most favorable to the jury's guilty verdicts.  *United States v. Khatallah*, 41 F.4th 608, 624 (D.C. Cir. 2022) (per curiam).

3

committee that raised and spent money to support Donald Trump's presidential campaign. JA 172-73, 175. However, Benton resigned from that role in May 2016 after being convicted for several federal campaign-finance crimes. JA 250, 269-71; *see also United States v. Benton*, 890 F.3d 697 (8th Cir. 2018). Benton nonetheless remained connected to those fundraising for then-candidate Trump. *See* JA 251-53.

That made Benton a natural person to coordinate an encounter between Trump and Roman Vasilenko—a Russian billionaire and politician. Benton's colleague, Doug Wead, had taken $80,000 from Vasilenko in return for a charitable award and a meeting with a high-profile American when Vasilenko visited the United States in late September 2016. JA 175-77, 183-84. But by mid-September, Wead had tried and failed to arrange a meeting with both a former president and a sitting senator. JA 178-81. Running out of time, Wead then pitched Vasilenko on a meeting with Donald Trump. JA 186-87, 316. Vasilenko was "excited" about that idea, so Wead called Benton. JA 188, 239.

Benton reached out to his contacts. JA 321-22. He claimed to have a friend who spent time "in the Caribbean" and wanted "a photo" with Trump at a "funder," although the friend might donate more than what

4

any such photo would require.  *Id.*  Benton's contacts noted that Trump would attend a Philadelphia fundraiser in late September.  JA 190-92, 317-18.  With that information, Benton spoke to Wead, JA 315 (September 13, 2016), and, the next morning, Vasilenko signaled that he was "happy and ready to wire his donation," JA 319.  Benton then confirmed to the Trump fundraising team that his friend wanted "to do the Philly event."  JA 320.

With Vasilenko on board, Benton kept collecting information about the Philadelphia fundraiser.  JA 315, 320.  The event had two possible itineraries.  Those who donated at least $5,400 would attend a general reception and have "a quick meet-and-greet," "[a] handshake[,] and a picture" with Trump.  JA 168, 326.  Those who donated $25,000 could also join Trump at a roundtable discussion, and those willing to give $50,000 or $100,000 respectively could even become roundtable "sponsor[s]" or "host committee" members.  JA 323.  After a few more calls with Wead, Benton began signaling interest in the pricier roundtable tickets.  JA 194-95, 329.

Benton also discovered during this time that a joint fundraising committee named Trump Victory was hosting the Philadelphia

fundraiser.  JA 325.  That committee would distribute the event's proceeds to two federal political committees (Donald J. Trump for President, Inc. and the Republican National Committee) and some Republican state parties.  JA 163, 167, 325.  These entities would spend those funds "in connection with federal elections."  JA 162-63, 325.  With the presidential election close at hand, the funds would "go toward electing the presidential candidate," through things like "get-out-the-vote efforts."  JA 159-60.

**2.**    As Benton gathered this information, he, Wead, and Vasilenko set out to handle Vasilenko's donation "correctly."  JA 319.  Foreign nationals cannot make a "contribution" to political committees or in connection with American elections more broadly.  52 U.S.C. §§ 30101(8)(A)(i), 30121.  Nor could Benton and Wead take Vasilenko's money and make a "contribution" in his stead—*i.e.*, make a conduit contribution.  *Id.* §§ 30101(8)(A)(i), 30122.  These rules are well known in the political-fundraising industry and especially familiar to campaign managers like Benton.  JA 152-56, 174.

Benton and Wead solved these problems through subterfuge. They laundered Vasilenko's donation using a company Benton owned,

6

invoicing Vasilenko and accepting $100,000 for pretextual consulting services.  JA 196-207, 332, 354-59.  Benton then waited until two days before the fundraiser to order roundtable tickets for "Doug Wead and a guest."  JA 333.  Benton eventually disclosed Vasilenko's name, but never his foreign-national status.  JA 225-26, 248-49.  Benton also chose not to pay for the tickets before the fundraiser took place.  *See* JA 256-58.

Vasilenko and Wead attended the Philadelphia fundraiser.  JA 214-16, 260.  They participated in the roundtable with Trump and other Republican political figures, JA 260, and also attended the general reception and photo opportunity, *see* JA 365.  Wead and the fundraiser staff both photographed Vasilenko near or with Trump.  JA 214-16, 241-43, 360-63, 365.

**3.**    After the fundraiser, Vasilenko shared these photographs on Instagram to boost his reputation in Russia, JA 241-43, and "bragged about meeting Mr. Trump and sitting in his office and speaking with him personally," JA 240.  Russians came to "consider[]" Vasilenko "almost the only one who personally met and knows Trump."  JA 364.  Vasilenko was even "invited to speak" on the "most influential TV Channel in Russia . . .

7

about Trump, about his attitude towards Russia[,] and his possible political moves connected with Russia." *Id.*

Meanwhile, Benton waited over a month to send Vasilenko's money to Trump Victory.  JA 213, 227-30.  After delaying and deleting several inquiring emails, JA 219-21, 259, Benton eventually sent over $25,000 and falsely claimed to have made the contribution for Vasilenko's roundtable ticket, JA 224, 352-53.  As Benton knew it would, that lie caused Trump Victory and two constituent political committees that received part of the contribution to file false campaign-finance disclosures with the FEC.  JA 152-57, 174, 261-68.

## II.    Procedural History

Based on these events, a grand jury charged Benton and Wead with the offenses listed above.  *Supra*, at 3.  Before trial, Benton moved to dismiss his Section 1519 charges on the ground that the statute did not apply to false disclosure reports filed with the FEC, JA 60-63, and sought to preclude the government from introducing his prior pardoned campaign-finance convictions under Federal Rules of Evidence 404(b) and 609, JA 65-66, 70-73.  The district court denied these motions.  JA 98-101, 108-16.

8

After a six-day trial, a jury convicted Benton on all counts.[2]  JA 442-43.  The district court denied Benton's motions for a judgment of acquittal, which claimed that the government had failed to prove a FECA "contribution."    JA 274-89, 434.    The court sentenced Benton to 18 months' imprisonment and two years of supervised release.  JA 444-45.

## III.  Rulings Under Review

Benton challenges: (1) the jury instructions concerning FECA "contributions," JA 389, 393-97, 405; (2) the denial of his motion to dismiss the Section 1519 charges, JA 98-101; (3) the admission of his pardoned prior convictions under Federal Rule of Evidence 404(b)(2), JA 105-13; (4) consideration of the pardoned crimes at sentencing; and (5) a Rule 404(b) limiting instruction, JA 386-87.

## SUMMARY OF ARGUMENT

Benton's claims lack merit and do not warrant relief.  This Court should affirm his convictions and sentence.

1.    The district court did not plainly err when it used the parties' joint-proposed jury instructions to guide the jury as to how to find a FECA contribution.  Such a "contribution" includes any "gift . . . made by

---

[2] Wead died before trial.

9

any person for the purpose of influencing" any federal election. 52 U.S.C. § 30101(8)(A)(i). That language has long referred to donations that society "general[ly] understand[s]" to influence elections—such as donations "to a candidate or political party or campaign committee." *Buckley v. Valeo*, 424 U.S. 1, 23 n.24 & 78 (1976) (per curiam).

Section 30101(8)(A)(i)'s text and context, FECA's structure, and the FEC's long-held view of that provision still support that reading. Certainly, they do not plainly support Benton's novel argument that a contribution occurs only if one donates—not just with a subjective intent to influence a federal election—but with a "primary purpose" of doing so. Nor can Benton now raise a sufficiency-of-the-evidence claim based on that unprecedented reading of Section 30101(8)(A)(i). *See United States v. Reynoso*, 38 F.4th 1083, 1090-91 (D.C. Cir. 2022). Finally, even Benton's proposed standard would not justify setting aside his convictions given the ample evidence that Vasilenko had a "primary purpose" to influence a federal election.

**2.** The government properly charged Benton with obstructively causing the creation of false documents or records. 18 U.S.C. §§ 1519, 2(b). Coupled with Section 2(b), Section 1519 plainly and broadly outlaws

10

causing another to make false statements in any document or record with the intent to impede or obstruct any federal investigation or agency proceeding. It therefore punished Benton's lie that he made the contribution in this case, as Benton intended the lie to cause Trump Victory and others to submit false reports to the FEC and prevent that agency from enforcing FECA against Benton or Vasilenko.

That the government could have charged Benton under other federal statutes did not prevent it from charging him under Section 1519. *See United States v. Batchelder*, 442 U.S. 114, 123-24 (1979). The government enjoys broad discretion to bring charges under any law that prohibits a defendant's conduct, unless Congress has clearly signaled that one criminal statute will apply to the exclusion of another. And here, nothing in FECA's false-reporting crimes provision, 52 U.S.C. § 30109(d)(1)(A), or Section 1519 suggests that only FECA may punish defendants who, with obstructive intent, make false reports to the FEC.

**3.** The district court committed no reversible error in how it handled Benton's pardoned prior convictions. It first permissibly admitted the convictions at trial under Federal Rule of Evidence 404(b)(2). That rule of inclusion permits using acts of any kind as

11

substantive evidence for relevant non-propensity purposes, *see United States v. Long*, 328 F.3d 655, 660-61 (D.C. Cir. 2003), and contains no plain bar on using pardoned convictions of any kind for such purposes.

The district court also supportably found that Benton did not receive a rare pardon "based on innocence" or an "error of law," further precluding his evidentiary and sentencing claims. The President never stated in the actual pardon or elsewhere why he granted Benton clemency. A press release from the White House Press Secretary at the time also said nothing about the President's motivations. It instead presented only the distinct views of a former FEC Chairman, who thought that the reporting law Benton violated had been "unclear and not well established at the time" (hardly a finding of innocence or an error of law). Based on all this, the court essentially found that Benton received a generic pardon, which does not "blot out guilt or expunge a judgment of conviction." *In re North*, 62 F.3d 1434, 1437 (D.C. Cir. 1994).

4. Last, the district court did not deliver a plainly and reversibly mistaken limiting instruction about Benton's prior convictions. The unobjected-to instruction hewed to the court's Rule 404(b) ruling, allowing the jury to use the prior-crimes evidence to evaluate Benton's

12

*mens rea* and understand the criminality of Benton's false-invoicing plan (a *modus operandi* of his).  The court then repeatedly cautioned the jury against drawing propensity inferences from Benton's prior crimes.

If flawed, the Rule 404(b) instruction was not plainly defective or substantially prejudicial here.  For example, allowing the jury to use Benton's prior crimes to determine his "identity" as the one who took the criminal acts in this case would not have harmed Benton at all; Benton undisputedly took those acts.  And the district court's warnings against propensity inferences would once again have prevented the jury from making any unfair inferences.

## ARGUMENT

### I.    Benton's FECA Convictions Are Sound.

Benton challenges his FECA convictions, which hinged partly on whether Vasilenko made a "contribution."  52 U.S.C. § 30101(8)(A)(i).  For the first time on appeal, Benton attacks the jury instructions and sufficiency of the evidence on the novel theory that Vasilenko could have made a "contribution" only by donating with "the primary purpose of influencing a federal election."  Br. 16.  These arguments fail.  If not waived, the jury-instruction claim faces plain-error review, misconstrues

13

the jury instructions in this case, and misreads FECA. Meanwhile, any attempt to recast this claim of "instructional error" as "an insufficiency-of-the-evidence error" is a non-starter under binding precedent. *United States v. Reynoso*, 38 F.4th 1083, 1090-91 (D.C. Cir. 2022).

### A.    Legal Background

Congress enacted FECA and its progeny "with the aim of 'remedying any actual or perceived corruption of the political process.'" *Campaign Legal Ctr. v. FEC*, 31 F.4th 781, 784 (D.C. Cir. 2022) (brackets and citation omitted). These laws guard "the integrity of our system of representative democracy" and ward against "pernicious practices" that once infected federal political campaigns. *Buckley v. Valeo*, 424 U.S. 1, 26-27 (1976) (per curiam). Currently, they do so through three "mechanisms: contribution limits, source restrictions, and disclosure requirements." *Campaign Legal Ctr.*, 31 F.4th at 784.

The FEC and the Department of Justice, respectively, bring civil and criminal enforcement actions relating to FECA. *See* 52 U.S.C. §§ 30107(e), 30109. These enforcement regimes concern the same contribution limits, source restrictions, and disclosure requirements, but they entail different *mens rea* requirements and burdens of proof. *See* 52

14

U.S.C. § 30109(a)(4)-(6) and (d).  For example, those who violate FECA

may at times face administrative enforcement or civil liability no matter

their state of mind.  *Id.* §§ 30104, 30109(a)(5)(A), (6)(B).[3]  Criminal

liability awaits those who, beyond a reasonable doubt, "knowingly and

willfully commit[] a violation of" FECA.  *Id.* § 30109(d)(1)(A).

The government charged Benton with knowingly and willfully

violating two "source restrictions" when he enabled and disguised a

foreign-national contribution to an American political campaign.  *See* 52

U.S.C. §§ 30121, 30122.  The first restriction keeps foreign money out of

American politics by making it unlawful for, *inter alia*:

> "a foreign national, directly or indirectly, to make . . . a contribution
> or donation of money . . . in connection with a Federal . . . election"
> or "to a committee of a political party," *id.* § 30121(a)(1)(A)-(B); or
>
> "a person to solicit . . . a contribution or donation" from a foreign
> national, *id.* § 30121(a)(2).

*See generally United States v. Singh*, 979 F.3d 697, 709-10 (9th Cir. 2020).

The second restriction outlaws "mak[ing] a contribution in the name of

another person or knowingly permit[ting] [one's] name to be used to effect

---

[3] Some civil actions or heightened penalties do require a *mens rea* showing.  *See, e.g.*, 52 U.S.C. §§ 30109(a)(5)(B), (6)(C), 30116(f).  FECA also contains a safe-harbor for those who rely in good faith on FEC advisory opinions.  *See id.* § 30108(c).

15

such a contribution," 52 U.S.C. § 30122, and thereby cuts off one way of circumventing federal contribution limits and disclosure requirements.

As charged, the government thus needed to prove at trial a foreign-national "contribution" to demonstrate that Benton violated Sections 30121 and 30122. A "contribution" in these contexts is "any gift . . . of money or anything of value made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i).

## B.    Factual Background

1.    Before trial, the parties disagreed about what role the phrase "for the purpose of influencing" plays in defining a "contribution" under Section 30101(8)(A)(i). Benton contended that the phrase reflects an embedded *mens rea* requirement and that a donor like Vasilenko must have a specific subjective intent to influence a federal election before his donation counts as a "contribution." *See, e.g.*, JA 141. By contrast, the government argued that the phrase asks if a donation objectively serves such a purpose based on its surrounding circumstances—not a donor's subjective intent. *See, e.g.*, JA 141, 145-48.

16

The district court implicitly sided with Benton. A few weeks before trial, the parties submitted mostly joint-proposed jury instructions. JA 122-43. But Benton alone asked the court to instruct the jury that:

> [T]he Defendant's theory of the case is that the alleged contribution in this case was made not for the purpose of influencing any election for federal office, but for Mr. Vasilenko to receive a photograph with then-candidate for President Donald Trump for Mr. Vasilenko's own personal, business reasons.

> If you find that the alleged contribution in this case was not made for the purpose of influencing any election for federal office, but rather for the securing of the photograph, then you must find the Defendant not guilty.

JA 141. The government objected based on its objective reading of Section 30101(8)(A)(i). JA 141, 145-48. But the court opted to give Benton's proposed instruction. JA 290 (referring to an email approving the instruction).

The government accordingly proceeded at trial under a subjective-intent reading of Section 30101(8)(A)(i)'s "for the purpose of" language. After all, the district court intended to instruct the jury to find no "contribution" (and Benton not guilty under FECA) if it found that Vasilenko made his donation to obtain a photograph with Trump for "personal, business reasons." JA 141. The government introduced evidence to prove Vasilenko's subjective intent, JA 423-27

17

(summarizing), and that evidence led the court to deny Benton's motions for a judgment of acquittal, JA 274-89, 434.

2.    The district court, meanwhile, finalized the jury instructions at a charging conference.  It made a slight and agreed-upon modification to the defense theory-of-the-case instruction, but was otherwise "inclined to go off the jury instructions" that the parties had provided.  JA 291-93. The court adopted wholesale the parties' proposed substantive instructions concerning the crimes charged.  *Compare* JA 127-37, *with* JA 390-99.  The court then added on the defense-proposed theory-of-the-case instruction.    JA 403-05.    Given that Benton proposed these substantive instructions, he neither objected to them nor asked the court to instruct the jury that a donor must have a "primary purpose of influencing a federal election" to make a FECA "contribution."  Br. 16.

The district court instructed the jury on these matters as follows. The court laid out the elements of Benton's alleged FECA crimes.  JA 389, 393-97.    It told the jury to convict Benton for violating the foreign-national contribution prohibition only if Benton "solicited a contribution of money or other thing of value from a foreign national or caused a foreign national directly or indirectly to make a contribution."  JA 393.

18

Similarly, the jury learned that the conduit-contribution charge required that Benton "was not the true source of the contribution." JA 396. The court also provided the jury Section 30101(8)(A)(i)'s definition of a "contribution," and gave the jury Benton's defense theory-of-the-case instruction. JA 389, 394, 397, 405. The jury convicted on all counts. JA 442-43.

## C.  The District Court Did Not Plainly Err When Instructing the Jury About FECA Contributions.

Benton now argues for the first time that the district court did not accurately guide the jury about how to find a FECA contribution. Again, a "contribution" includes "any gift . . . made by any person for the purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A)(i). Based on this definition, Benton claims the court should have instructed the jury that, to convict, it needed (1) "to make a finding about Vasilenko's purpose" when donating to Trump Victory and (2) "to find that [his] *primary* purpose was to influence a federal election." Br. 21. If not waived, these claims lack merit and fail under plain-error review.

### 1.    Standard of Review

As an initial matter, Benton's new jury-instruction claim is barred. The "instruction[s]" he challenges were "proposed jointly by the defense

and the prosecution, and if a defendant invites error by the district court, he is barred from complaining about it on appeal." *United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011) (per curiam) (cleaned up); *accord United States v. Bird*, 79 F.4th 1344, 1353 (11th Cir. 2023); *supra*, at 17-18.  If Benton could raise these claims, they would face plain-error review.  *United States v. Khatallah*, 41 F.4th 608, 627-28 (D.C. Cir. 2022) (per curiam).  To obtain relief, he would have to show an "(1) error, (2) that is plain, and (3) that affects substantial rights" and that "(4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 628.

"Meeting all four prongs of plain error is difficult." *Khatallah*, 41 F.4th at 628.  The "plain" error asserted must prove "clear or obvious," and that "rarely" happens with issues of "first impression." *Laureys*, 653 F.3d at 33.  Moreover, a defendant like Benton must show that any "plain error" at trial "affected [his] substantial rights," *i.e.*, created a "'reasonable probability' that the jury would have acquitted him." *Khatallah*, 41 F.4th at 628 (citation omitted).

2.    <u>The FECA Jury Instructions Contained No Plain Error.</u>

Benton's plain-error claims rest on two premises about what FECA means when it defines a "contribution" as a gift "made by any person for the purpose of influencing" a federal election.  52 U.S.C. § 30101(8)(A)(i). These claims require that the phrase "for the purpose of influencing" signal that a contribution arises only if:  (1) a donor subjectively intends his donation to influence a federal election and (2) the donor in fact has a "primary purpose" of influencing a federal election.  Both premises are wrong—or at least not plainly right.

a.    Section 30101(8)(A)(i) and its "for the purpose of influencing" language do not plainly link "contributions" to donors' subjective intent. Instead, it defines a "contribution" as a donation that an objective observer would deem "for the purpose of influencing" a federal election. That reading of Section 30101(8)(A)(i) best fits with precedent, FECA's context and structure, and the FEC's decades-long approach to what activities count as contributions.  *See Orloski v. FEC*, 795 F.2d 156, 162 (D.C. Cir. 1986) (agreeing that FECA may mandate an "objective test").[4]

---

[4] *Orloski* refused to read "for the purpose of influencing any election" or FECA generally as "unambiguously" requiring a subjective-

*Buckley* itself supports, if not mandates, this reading.  It construed the statute's verbatim predecessor and noted that the "connotation created by the general understanding of what constitutes a political contribution" clarified the phrase "for the purpose of influencing."  424 U.S. at 23 n.24.  That objective "general understanding" led the Court to "construe[]" a "contribution" to include—without apparent exception—certain donations.  *Id.* at 23 n.24 & 78.  Namely, it ruled that a "contribution" includes donations "made directly or indirectly to a candidate, political party, or campaign committee" or to "other organizations or individuals but earmarked for political purposes." *Id.* at 78; *cf. id.* at 80 (construing in a similar objective fashion the "for the purpose of influencing" language in Section 30101(9)(A)(i)'s "expenditure" provision).

Beyond precedent, Section 30101(8)'s definitional role and structure support an objective reading of "for the purposes of" in Section

_____

intent standard.  That precedent alone forecloses Benton's claim that FECA *plainly* mandates a subjective-intent standard in Section 30101(8)(A)(i).  *But cf. Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 27 n.21 (D.C. Cir. 2009) (stating in dicta and without discussing *Orloski* or FECA as a whole that *Buckley*'s footnote 24 "approved the use of a purpose standard," *i.e.*, intent standard, in defining a "contribution").

30101(8)(A)(i). Congress wrote Section 30101(8) to define a particular object (a "contribution"), not to create a crime or restriction. Putting Section 30101(8)(A)(i) temporarily aside, Congress then clearly relied on objective standards—with no regard to subjective intent—to prescribe what does or does not count as a contribution. *See* 52 U.S.C. § 30101(8)(A)(ii), (B). Congress's objective approach to defining a "contribution" in these adjoining subsections makes it unlikely that it pivoted towards a subjective-intent approach in Section 30101(8)(A)(i). *See Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 519-20 (1994) (relying on a similar argument to conclude that "primarily intended . . . for use" reflects an objective, not subjective intent, requirement).

FECA's broader enforcement regime also points toward an objective "contribution" reading in two ways. *See Orloski*, 795 F.2d at 162, 165. First, it imposes strict civil liability on federal candidates and political parties that, for example, fail to report contributions. *See* 52 U.S.C. § 30104(a)-(b); *supra*, at 15. Hinging a "contribution" on a donor's subjective intent could thus make regulated parties civilly liable based on a donor's mistaken belief that his donation could and would influence an election, even when his donation can have no such effect. *See Orloski*,

23

795 F.2d at 162, 165 (warning for this reason against a subjective-intent reading).  Second, Congress intended the FEC to take "rapid, decisive enforcement action."  *Id.* at 165.  But the FEC cannot practically investigate fact-intensive and circumstantial issues of subjective intent in "the most mundane [donation] allegations" or manage the "undu[e] burden" of constant "requests for advisory opinions" about what scenarios demonstrate a subjective intent to influence an election.  *Id.*  In short, a "subjective" standard would "make it next to impossible to police the statute."  *FEC v. Ted Haley Cong. Comm.*, 852 F.2d 1111, 1116 (9th Cir. 1988); *cf. United States v. Marschall*, 82 F.4th 774, 779-80 (9th Cir. 2023) (no specific-intent requirement in dual criminal-civil statute where that requirement could "substantially hinder" civil enforcement efforts).

Finally, reading Section 30101(8)(A)(i)'s "for the purpose of" language in an objective fashion comports with the FEC's longstanding approach to that provision and Congress's tacit blessing.  The FEC began promulgating regulations defining activities as "contributions" without regard to subjective intent soon after Congress granted it the authority to administer FECA.  *See Orloski,* 795 F.2d at 166; *Ted Haley*, 852 F.2d

24

at 1114-15.[5]  Congress has never disapproved of those interpretations.  If anything, in the many laws modifying FECA, Congress has followed the FEC's lead by deeming certain categories of donations *per se* outside Section 30101(8)'s contribution definition.  *Compare, e.g.*, 2 U.S.C. § 431(e) (1976), *with* 52 U.S.C. § 30101(8).

Section 30101(8)(A)(i) and FECA therefore count as a "contribution" any donation that an objective observer would view as "for the purpose of influencing" an election.  At the very least, Benton has not met his burden on plain-error review to show that Section 30101(8)(A)(i) "plainly" required the jury to delve into Vasilenko's state of mind when donating. That alone defeats his claims of plain error in the FECA jury instructions.

**b.**    If Section 30101(8)(A)(i)'s "contribution" definition plainly envisioned a subjective-intent inquiry, Benton's claims would still fail. The district court in fact instructed the jury to make a finding about Vasilenko's purpose.  And Benton's new pitch for an instruction further requiring the jury to find that Vasilenko had a "primary purpose" to

---

[5] The FEC has long concluded that "[t]he entire amount paid to attend a fundraiser or other political event . . . is a contribution." 11 C.F.R. § 100.53; *see also* 45 Fed. Reg. 15080, 10596 (Mar. 7, 1980).

influence a federal election stems from a strained—not plain—reading of Section 30101(8)(A)(i)'s "for the purpose of" language.

i.      The jury instructions did in fact require the jury to make a finding about Vasilenko's intent. *See United States v. McGill*, 815 F.3d 846, 888 (D.C. Cir. 2016) (per curiam) (reading instructions "as a whole"). The district court told the jury that Benton's FECA crimes rested on a contribution by a "foreign national" or someone other than Benton—*i.e.*, Vasilenko. *See* JA 393, 396. The court further explained that the jury would need to consider whether this "alleged contribution was made not for the purpose of influencing any" federal election, "but solely for . . . Vasilenko to receive a photograph with" Trump for "personal, business reasons." JA 405 (theory-of-the-case instruction). If the alleged contribution was made "solely" for Vasilenko's "personal, business reasons," the court directed the jury to acquit Benton. *Id.* These instructions "as a whole" thus directed the jury to make a finding about Vasilenko's subjective "purpose" when he donated.

ii.      FECA's "for the purpose of" language did not plainly require the district court to go further and instruct the jury that one must have a "primary purpose" of influencing a federal election to make a

26

"contribution." When "for the purpose of" signals a subjective inquiry, it almost never requires such a high showing. And nothing in Section 30101(8)(A)(i) or FECA mandates that rare standard; at most, a FECA contribution requires a "substantial" purpose to influence an election.

Courts rarely construe "for the purpose of" to refer to a person's primary purpose. The phrase allows for the reality that people have mixed motives, *see United States v. Torres*, 894 F.3d 305, 312-13 (D.C. Cir. 2018); *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008), and, when referring to a person's subjective intent, usually describes a "substantial," "significant," or "motivating" reason for a person's actions.[6] And although some courts occasionally use phrases like "dominant" or "primary purpose" when interpreting "for the purpose of," those decisions, at best, reflect the principle that statutory context matters. *See United States v. Shetler*, 665 F.3d 1150, 1162 (9th Cir. 2011) (21 U.S.C. § 856(a)); *United States v. Verners*, 53 F.3d 291, 296 (10th Cir.

---

[6] *See, e.g.*, *United States v. Flucas*, 22 F.4th 1149, 1164 (9th Cir. 2022) (18 U.S.C. §§ 2421, 2423); *United States v. Safehouse*, 985 F.3d 225, 237 (3d Cir. 2021) (collecting cases as to 21 U.S.C. § 856(a)); *Banks*, 514 F.3d at 969 (VICAR); *United States v. McCauley*, 983 F.3d 690, 697 (4th Cir. 2020) (18 U.S.C. § 2251(a)).

1995) (same)[7]; *see also Mortensen v. United States*, 322 U.S. 369, 374 (1944) (using the phrase "dominant motive" in dicta) (cited at Br. 18-19); *Torres*, 894 F.3d at 319-20 (Williams, J., concurring in part and dissenting in part) (noting that: this Court has never applied *Mortensen*; the case did not involve a mixed-motives situation; and other courts read "the dominant motive" wording as dicta); *id.* at 315-16 (majority opinion) (distinguishing *Mortensen*).

Nothing here plainly demands reading "for the purpose of" in Section 30101(8)(A)(i) to demand more than a "substantial" purpose. "Purpose" in a subjective-intent sense means "an end, intention, or aim, object, plan, project," Black's Law Dictionary 1112 (5th ed. 1979), or "[t]he object toward which one strives," American Heritage Dictionary of the English Language 1062 (New College ed., 1975). Tacking on a non-emphasized "the" here creates a focus on a "generic" but "particular" purpose: influencing. *Id.* at 1333 (defining "the"). Absent "stress[]" or emphasis, "the" does not signal "uniqueness or prominence." *Id.*; *accord*

---

[7] These courts do not use the "primary or principal" formulation for VICAR's "for the purpose of" language. *United States v. Garcia*, 74 F.4th 1073, 1122 (10th Cir. 2023); *Banks*, 514 F.3d at 969.

*Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019). *Contra* Br. 18-19 (adding italics to create "*the*"); *United States v. McCauley*, 983 F.3d 690, 695 (4th Cir. 2020) (overlooking the role of emphasis when it comes to "the").

Congress thus wrote in FECA a statute that does not envision a "primary purpose" requirement. If Congress had intended such a demanding standard, it would "have adopted language referring to "the . . . primary[] purpose" of the actor, *Banks*, 514 F.3d at 966, or somehow emphasized the word "the." But absent such language or emphasis, the statute does not speak in terms of a "primary" purpose. *Id.* ("[T]he use of the word 'the' does not bear the weight that Banks gives it." (brackets omitted)). *Contra* Br. 18-19.

Section 30101(8)(A)(i)'s remaining text further counsels against too demanding a reading of "for the purpose." The statute defines "contribution" to "*include*[] . . . *any* gift, subscription, loan, advance, or deposit of money or *anything of value* made by *any* person for the purpose of influencing *any* election for Federal office." 52 U.S.C. § 30101(8)(A)(i) (emphases added). This definition is rife with expansive words, and an overly limiting definition of "for the purpose of" would "clash[] strongly with the sweeping, everyday language on either side of the term."

*United States v. Rodgers*, 466 U.S. 475, 480 (1984); *see also United States v. Gonzales*, 520 U.S. 1, 5 (1997) (discussing the broad meaning of "any"). A subjective-intent requirement that demands only that a donor have a "substantial" purpose to influence a federal election therefore best accords with the provision's inclusive textual gist.

Section 30101(8)(A)(i)'s context buttresses this interpretation. Its definition draws upon the "general understanding of what constitutes a political contribution." *Buckley*, 424 U.S. 23 n.24. Such a general understanding does not parse the difference between donations with a "substantial" versus "primary" purpose to influence an election. Consider, for example, a husband who supports a political candidate, but buys a ticket to the candidate's fundraiser mainly to join his spouse and friends on a social outing. The "general understanding" is that the husband has made a "political contribution," even though he arguably had only a "substantial" non-primary purpose to influence an election. *Id.* (contribution includes "[f]unds provided to a candidate or political party or campaign committee either directly or indirectly").

Finally, FECA's overarching purpose points away from a formidable specific-intent standard. The statute regulates contributions

to prevent *quid pro quo* corruption or the appearance of such corruption. *Citizens United v. FEC*, 558 U.S. 310, 359 (2010); *Buckley*, 424 U.S. at 26. But corruption and the appearance of corruption can still arise when a donor gives money with only a "substantial" purpose to influence a federal election. Reading "for the purpose of" to include donations with such a "substantial" purpose thus best addresses "broadly the problem of political campaign financing." *Buckley*, 424 U.S. at 78; *cf. Banks*, 514 F.3d at 967 (looking to VICAR's context and broad remedial purpose to reject a "primary purpose" test).[8]

FECA's text, context, structure, and purpose thus explain why at most a "substantial"—not "primary"—purpose test should apply here. Donors will inevitably claim (or have others claim for them) "plausible alternative motivation[s] for their acts," *Banks*, 514 F.3d at 967; Benton's theory at trial about Vasilenko's motivations is proof positive of that. Therefore, if all involved must "rank[] the reasons" that a donor had for

---

[8] FECA's five-year maximum penalty for contribution crimes, 52 U.S.C. § 30109(d)(1), lowers the need for a prominent specific-intent requirement. *Cf. McCauley*, 983 F.3d at 696 (discussing by contrast how the 15-year mandatory-minimum penalty in Section 2251(a) "underscore[d] the requisite seriousness of intent").

giving to a candidate, party, or campaign committee, the resulting FECA "safe harbor" for these donors should not be wide. *Id.*

      3.   <u>Benton Has Not Shown An Effect On Substantial Rights.</u>

Had Benton shown a plain instructional error, he still could not establish that the error "affected [his] substantial rights," *i.e.*, created a "'reasonable probability' that the jury would have acquitted him." *Khatallah*, 41 F.4th at 628 (citation omitted). The trial provided the jury with strong circumstantial evidence that Vasilenko primarily intended to influence a federal election through his donation. *See Torres*, 894 F.3d at 311 (noting that "direct evidence of mental state . . . is rare"). That purpose can be seen in the "circumstances known to him when he" donated and his "conduct before, during, [and] after" his donation. *Id.*

Start with what Vasilenko knew on September 19 and 20—when he wired Benton $100,000 to attend the Philadelphia fundraiser. Trump was the Republican Party's presidential nominee and would soon compete for the presidency. JA 159-60. Meanwhile, with the general election drawing near, the Trump campaign and related political committees needed money to fund election-related activities. *Id.* They obtained that money in part through political fundraisers like the one in

32

Philadelphia. JA 159-60, 164. Vasilenko was an educated billionaire running for political office in Russia, *see* JA 175, 208, 238, and jurors would infer that he knew all this.

Yet Vasilenko signaled that he was "happy and ready to wire his donation." JA 319. That matters because, as Benton puts it, "'[f]unds provided to a candidate or political party or campaign committee' generally do have the primary purpose of influencing a federal election." Br. 20 (quoting *Buckley*, 424 U.S. at 23 n.24).[9] Indeed, the only reason Benton has ever offered for resisting this general rule was that Vasilenko wanted a "picture" with Trump for personal, business reasons. *See* Br. 24 (summarizing these efforts); JA 310 (defense summation).

The size of Vasilenko's "donation" made that theory implausible. Vasilenko wired $100,000 to Benton for his "donation." JA 208-11. That sum far outstripped the $5,400 needed for Vasilenko to obtain just a photograph with Trump at the Philadelphia fundraiser. JA 326. It also significantly exceeded the $25,000 that Vasilenko would have needed to

---

[9] Evidence of a donation to a political committee would alone provide powerful evidence from which the jury could infer a donor had a subjective intent to influence an election.

attend a roundtable with Trump or the $50,000 needed to serve as a "roundtable sponsor." JA 323. Donating $100,000 would have made someone part of the "roundtable host committee"—the highest donor status available at the fundraiser. *Id.*[10]

In any event, the evidence supported the idea that Vasilenko's donation had two primary purposes: a photograph with Trump and a desire to help Trump become president. People can have multiple primary purposes for their actions that overlap and reinforce one another. *Cf. In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 759 (D.C. Cir. 2014) (discussing this principle in the attorney-client privilege context). Here, a photograph with President Trump would do more for Vasilenko's reputation and influence than would a photograph with just former-candidate Trump. Vasilenko certainly recognized as much.

---

[10] Granted, Benton kept most of Vasilenko's $100,000. But that says nothing about what Vasilenko intended. And even if Vasilenko intended to pay Benton a finder's fee, the evidence suggests that he approved at least $50,000 going towards the fundraiser. JA 333.

34



JA 365; *see also* JA 241-43 (discussing how, after Trump's victory, Vasilenko posted on Instagram a second photograph of him and Trump, reading in Russian: "Two Presidents:  Donald Trump Versus Roman Vasilenko").

### D.    Benton Has Not Raised a Proper Sufficiency Claim.

To the extent Benton suggests (Br. 25-30) that a showing of instructional error would entitle him to "outright" acquittal, that argument "is a non sequitur."  *Reynoso*, 38 F.4th at 1091.  It turns entirely on whether Vasilenko had a "primary purpose" to influence a federal election when he donated to Trump Victory—a supposed FECA

35

element not in the statute or the law of any circuit. This Court does not examine "the sufficiency of evidence of an element that the Government was not required to prove under the law of [this] circuit at the time of trial." *Reynoso*, 38 F.4th at 1091. Instead, it treats such claims as "'a claim of trial error' in failing to instruct the jury on the omitted element." *Id.* (citation omitted). For the reasons given above, that claim of trial error fails here (as would any sufficiency claim properly before the court on this ground, *see Khatallah*, 41 F.4th at 624).

## II. The Government Properly Charged Benton Under 18 U.S.C. § 1519.

Benton next claims that his convictions under Section 1519 cannot stand because the government may prosecute those who submit false reports for any reason to the FEC only under FECA. Br. 45. He is wrong.

### A. Background

When paying for Vasilenko's roundtable ticket, Benton claimed that he made the required $25,000 contribution for that ticket. JA 352-53. As Benton planned, that lie caused Trump Victory and two political committees to make false reports to the FEC that Benton, not a foreign national, had made the contribution. JA 152-57, 174, 261-68.

The government charged Benton with three counts under 18 U.S.C.

§§ 1519, 2(b).  JA 32-34.  Section 1519 punishes, in relevant part:

> Whoever knowingly . . . falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States . . . or in relation to or contemplation of any such matter.

18 U.S.C. § 1519.  Section 2(b) prohibits "willfully caus[ing] an[y]" federal

crime to occur.  *Id.* § 2(b).  Together, the statutes prohibit any person

from willfully causing the creation of false records with the intent to

impede, obstruct, or influence a governmental matter.  *See id.* §§ 1519,

2(b).  And the government alleged that Benton thrice violated this

prohibition by knowingly and obstructively causing political committees

to file with the FEC three reports falsely naming Benton as the

"contributor" for Vasilenko's roundtable ticket.  JA 32-34.

Benton moved to dismiss the Section 1519 charges before trial.

JA 60-62.  He claimed that the statute did not apply to false statements

in FEC disclosures because it punished only "the destruction or

falsification of corporate financial documents."  JA 61.  In his view, the

proper route to charge such crimes was FECA's general prohibition on

37

"knowingly and willfully" violating its "reporting" requirements. 52 U.S.C. §§ 30104, 30109(d)(1)(A); *see* JA 62.

The district court denied Benton's motion. JA 98-101. It found Section 1519's text "not limited to any particular context, corporate fraud-related or otherwise" and cited to several decisions applying the statute in the campaign-finance context. JA 100. For these reasons, the court ruled that the statute "encompasse[d] the charge[s] against" Benton. JA 101.

### B.    Standard of Review

This Court reviews *de novo* the district court's interpretation of Section 1519 and its denial of Benton's motion to dismiss for failure to state an offense under that statute. *See United States v. Fischer*, 64 F.4th 329, 334-35 (D.C. Cir. 2023), *cert. granted*; *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014).

### C.    Section 1519 Punishes Benton's Conduct.

To interpret a statute, this Court "begin[s] by analyzing the statutory language" and assumes "that the ordinary meaning of that language accurately expresses the legislative purpose." *Fischer*, 64 F.4th at 335. If the "statute's language is clear, then that language controls."

38

*Id.* Other interpretive tools, such as "[c]anons of construction," cannot obscure plain and unambiguous language. *Id.*

1.    Section 1519's text is broad, but clear.  In relevant part, it punishes "[w]hoever knowingly . . . falsifies, or makes a false entry in *any* record [or] document . . . with the intent to impede, obstruct, or influence the investigation or proper administration of *any* matter" within a federal agency's jurisdiction.  18 U.S.C. § 1519 (emphases added).  In doing so, the statute first describes persons who knowingly falsify or make false entries in records or documents "of whatever kind." *See Gonzales*, 520 U.S. at 5 (defining "any").  But Section 1519 then cabins its reach to persons that intend their false records or entries "to impede any federal investigation or proceeding." *Yates v. United States*, 574 U.S. 528, 547 (2015) (plurality opinion).  Even so, the statute applies in a "multiplicity of contexts," *id.* at 542 n.5, as there exist many federal agencies and departments that investigate and administer countless "matters" that a person might seek to impede, obstruct, or influence. *Cf. United States v. Scott*, 979 F.3d 986, 991-92 (2d Cir. 2020) (noting Section 1519's "unambiguously broad" language (brackets omitted)).

One federal agency with "matters" falling within Section 1519's broad scope is the FEC. *Benton*, 890 F.3d at 711. That "agency" has jurisdiction over the campaign-finance laws and investigates and administers related matters. *See* 52 U.S.C. §§ 30106, 30107. As mandated by statute and pertinent here, the FEC gathers periodic reports from political candidates and entities about the "contributions" they receive and their "expenditures" and then makes these disclosures available for public inspection. *See id.* §§ 30104, 30111(a). The reports keep the public informed about political fundraising and spending. They also assist the FEC in investigating and punishing campaign-finance violations. *See id.* §§ 30106, 30109; JA 266-68.

Section 1519's text therefore reaches those who intend to impede the FEC's reporting regime through knowingly false disclosure reports. *See* Br. 48; *Benton*, 890 F.3d at 711; *United States v. Emmons*, 8 F.4th 454, 478-79 (6th Cir. 2021). Disclosure reports concerning contributions constitute "records," and regulating contributions and expenditures is a "matter[] within" the FEC's purview. *Benton*, 890 F.3d at 711. When combined with Section 2(b), Section 1519 clearly prohibited Benton's

40

conduct here: knowingly causing with obstructive intent another person to make a false entry in an FEC disclosure report. *Id.*

2. This Court may "end [its] analysis there." *Fischer*, 64 F.4th at 343. But Benton looks past this plain text and argues that FECA displaces Section 1519 because a "more specific statute will be given precedence over a more general one, regardless of their temporal sequence." Br. 47 (citation omitted). That principle does not apply here.

a. Benton first overlooks (Br. 48) that Section 1519 is at least as specific to Benton's particular conduct as FECA's general false-reporting crime. FECA creates general false campaign-reporting crimes that punish those who "knowingly and willfully" violate its "contribution, donation, or expenditure" reporting rules. 52 U.S.C. § 30109(d)(1)(A).[11] Section 1519 punishes a subset of individuals making false reports to the

---

[11] One acts "willfully" under FECA when he knows "that his conduct is unlawful." *United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023). Those committing FECA false-reporting crimes must thus appreciate that making false campaign-finance disclosures is illegal, but need have no particular specific intent when making false disclosures. *See id.* at 332-33 (collecting cases and reading "willfully" this way given FECA's "reasonably straightforward" rules about fundraising and spending); *United States v. Burden*, 934 F.3d 675, 690-92 (D.C. Cir. 2019) (using similar reasoning to define similarly a "willfulness" requirement).

41

FEC: those who do so with the specific intent to impede, obstruct, or influence the FEC's investigations and activities. Put another way, defendants who violate Section 1519 have almost certainly violated FECA. But the converse is not true; someone can violate FECA without having the obstructive specific intent needed to violate Section 1519. That makes Section 1519 as specific to Benton's conduct as FECA (if not more so), and, if the specific-general rule mandated charging a defendant with the most specific offense, as Benton says, the government complied.

**b.** Yet there lies the deeper flaw in Benton's argument: the government may charge a defendant under any statute that proscribes his conduct. *United States v. Batchelder*, 442 U.S. 114, 123-24 (1979). It matters not if one crime is more specific than another. Indeed, this Court affirmed as much when it permitted prosecuting false statements to the FEC under the "more focused" FECA or the general false-statements crime in 18 U.S.C § 1001. *United States v. Hsia*, 176 F.3d 517, 525-26 & n.5 (D.C. Cir. 1999); *see also United States v. Jackson*, 805 F.2d 457, 460-61 (2d Cir. 1986) (collecting cases for the principle more generally).

Benton must thus take another tack to show that the government may not prosecute him under Section 1519. Assuming that Section 1519

42

is the more general statute, he must show that when Congress enacted

that law, it somehow signaled an intent for the law to not apply to acts

already criminal under FECA. *See United States v. Jones*, 607 F.2d 269,

272-73 (9th Cir. 1979); *see, e.g.*, *United States v. Bilzerian*, 926 F.2d 1285,

1300 (2d Cir. 1991) (rejecting an argument like Benton's); *United States*

*v. Coachman*, 727 F.2d 1293, 1300 n.30 & 1302 n.43 (D.C. Cir. 1984)

(same); *United States v. Computer Scis. Corp.*, 689 F.2d 1181, 1186-88

(4th Cir. 1982) (same).

     Benton cannot make that showing.  Again, Section 1519's clear text

covers creating knowingly false documents to impede federal agencies'

functions.  *Supra*, at 39-41; *cf. Coachman*, 727 F.2d at 1302 n.43.  Its

legislative history also shows that Congress intended Section 1519 to

apply to people "destroying, altering, or falsifying documents to obstruct

any governmental function."  *Yates*, 574 U.S. at 542 n.5 (plurality

opinion) (quoting S. Rep. No. 107-146 at 15 (2002)); *cf. Coachman*, 727

F.2d at 1302 n.43.  And although FECA and Section 1519 overlap in part,

they target "separate evils, proscribe different acts and require proof of

different elements," suggesting that they operate separately.  *Coachman*,

727 F.2d at 1302 n.43 (cleaned up); *supra*, at 41-42.

If anything, Congress appears to have used Section 1519 and FECA to create a rational "framework in which the degree of punishment corresponds to the presence of specific intent." *Jones*, 607 F.2d at 274. Those who knowingly and willfully make false reports to the FEC have violated FECA and may face up to five years in prison. 52 U.S.C. §§ 30104, 30109(d)(1)(A). But those who take the same steps with an extra, obstructive intent have committed a "more blameworthy" crime. *United States v. Mohammed*, 693 F.3d 192, 199 (D.C. Cir. 2012). Section 1519 reasonably then allows prosecutors to charge obstructors with a crime carrying a higher potential penalty. *Cf. id.*; *Jones*, 607 F.2d at 274.

Rather than engage with Section 1519's text or how it operates in this space, Benton zeroes in on FECA. He discusses (Br. 45-46, 52-53) that statute's role governing political fundraising and campaign finance and worries (Br. 51-52, 54) that Section 1519 allows prosecutors to bring greater punishments than pure FECA crimes allow. But again, FECA's role as a statute "more focused" on campaign finance alone says nothing about Congress's intent to allow for prosecutions of bad behavior in that area under other federal statutes. *Hsia*, 176 F.3d at 525-26 & n.5. And although Section 1519 authorizes higher penalties for those in the

44

campaign-finance world when they obstruct the FEC's operations, it does not mandate those penalties—as this very case shows. Nor does it displace FECA as the main penal mechanism for more routine false-reporting crimes. *See Mohammed*, 693 F.3d at 199 (giving effect to overlapping criminal statutes, where a worse specific-intent crime carries a greater penalty); *Jones*, 607 F.2d at 274 (same).

Benton's cited authorities are not to the contrary. For example, in *United States v. LaPorta*, the Second Circuit confronted a statute with two subsections defining different crimes, one specific and one general. 46 F.3d 152, 156-57 (1994). The more general crime carried the harsher penalty and could have been read (based on an "equivocal" phrase) to sweep broadly and punish all the conduct targeted in the more specific crime. *Id.* But the court of appeals rejected that reading based on the statute's legislative history, the rule of lenity, and the principle that a specific statute takes precedence over a general statute. *Id.* Those features contrast sharply with the plain language and legislative history of Section 1519, which leaves no doubt that it applies here.

Two other cases that Benton discusses did not even confront when the government must charge one crime over another. Rather, they

45

concerned what enhancements applied at sentencing. *See Busic v. United States*, 446 U.S. 398, 407 (1980); *Simpson v. United States*, 435 U.S. 6, 12-13 (1978); *see also United States v. Schaffner*, 715 F.2d 1099, 1102 (6th Cir. 1983) (noting this distinction); *Computer Scis. Corp.*, 689 F.2d at 1187 (same).  In any event, those cases too resorted to the specific-general principle only after finding statutory ambiguity, relying on legislative history, and invoking the rule of lenity. *See Busic*, 446 U.S. at 404-10; *Simpson*, 435 U.S. at 13-16.

Benton lastly seeks to cabin prosecutorial discretion in a footnote. He suggests that the government may choose to prosecute only between two overlapping statutes "framed at comparable levels of generality."  Br. 51 n.3.  But that is not the law. *See, e.g.*, *Hsia*, 176 F.3d at 525-26 & n.5; *Jackson*, 805 F.2d at 460-61.  And if Section 1519's application to crimes like Benton's threatened to "nullif[y]" FECA false-reporting crimes (it does not, *supra*, at 41-42), the unambiguous language in Section 1519 would still compel the conclusion that Congress nevertheless granted prosecutors such a tool, *see Mohammed,* 693 F.3d at 199.[12]

---

[12] Benton's attack (Br. 54-55) on the Department of Justice's approach to prosecution of campaign-finance violations, as reflected in

## III. The District Court Committed No Reversible Error as to Benton's Pardoned Convictions.

Benton raises (Br. 30-44) two intertwined claims concerning his prior pardoned campaign-finance convictions. Both claims fail.

### A. Factual Background

1. Benton was previously convicted of campaign-finance crimes. JA 335; *Benton*, 890 F.3d 697. He and his coconspirators "use[d] two intermediary companies" and "false invoices" to "conceal . . . payments to [a] state senator by a political committee." JA 334-35. In doing so, they "cause[d] a political committee to keep false records and submit false reports to the FEC." JA 335. A jury therefore found Benton guilty of causing the creation of false records, in violation of 18 U.S.C. §§ 1519 and 2; causing false campaign-expenditure reports, in violation of 52 U.S.C. §§ 30104, 30109; carrying out a false-statements scheme, in violation of 18 U.S.C. §§ 1001 and 2; and conspiring to commit these offenses. *Id.*

---

the Department manual, *Federal Prosecution of Election Offenses*, is misdirected. That approach reflects cautious consideration, guided by experience and relevant legal developments, of how prosecutorial discretion might best be exercised in prosecuting criminal conduct in election campaigns.

In December 2020, President Trump granted Benton "a full and unconditional pardon for his conviction" on the operative "superseding indictment" in his prior case and noted Benton's already-served sentence. JA 341 (capitalization altered).  The actual pardon did not explain why the President pardoned Benton.  *Id.*

A statement that the White House Press Secretary released about Benton's pardon noted that Benton was "convicted based on indirect campaign payments to a state Senator."  JA 348-49.  It further stated that, "[a]ccording to" "Lee Goodman, former chairman of the [FEC], . . . the reporting law [Benton] violated was unclear and not well established at the time."  *Id.*  The Press Secretary's statement concluded by noting that Benton had "received 6 months home confinement and 2 years' probation" for his crime.  JA 349.

**2.**    Before trial in this case, the government moved to admit Benton's now-pardoned campaign-finance convictions.  JA 37-44.  It sought to introduce the convictions and their underlying facts as substantive evidence under Federal Rule of Evidence 404(b)(2).  In the main, it argued that those past FECA-related crimes and the methods that Benton used to conceal those crimes echoed this case's facts here and

48

thus tended to prove his criminal "knowledge, willfulness, intent, *modus operandi*, and lack of mistake or accident" here. JA 37-39. The government also wished to impeach Benton, if he testified, with these convictions under Federal Rule of Evidence 609. JA 40-44.

Benton opposed the government's motion. He disputed that the pardoned convictions would serve a valid Rule 404(b)(2) purpose and further claimed that admitting the pardon would prove substantially more prejudicial than probative. JA 65-66; 70-73. As for Rule 609 purposes, Benton separately noted that rule's prohibition on impeaching a witness's character for truthfulness with convictions pardoned based on a finding of innocence and claimed his pardon entailed such a finding. JA 67-68, 73-74. But he never claimed that convictions pardoned based on innocence were also categorically inadmissible under Rule 404(b)(2).

The district court ruled that the government could introduce Benton's prior convictions under both Rule 404(b)(2) and Rule 609. JA 108-17. It explained that the convictions were admissible under Rule 404(b)(2) to show that Benton knowingly and willfully violated FECA and for his *modus operandi*. JA 110. In ruling on the Rule 609 issue, the

court found nothing in Benton's pardon or the accompanying press statement that amounted to a "finding of innocence." JA 115-17.

At trial, the district court admitted Benton's prior convictions and pardon through a Rule 404(b)(2) stipulation. JA 269-71. The court then instructed the jury as to how to use those convictions. *See generally infra* at 60-61 (Issue IV).

**3.** Benton's prior convictions came up again before sentencing, when the Probation Office assigned him one criminal-history point for those pardoned convictions. SJA 2. The Probation Office acknowledged that convictions pardoned based on innocence or errors of law do not receive criminal history points under the Guidelines. SJA 3. But the Probation Office concluded that Benton had not received such a pardon. SJA 3, 5.

Although Benton initially objected to this finding, SJA 5, he accepted the Probation Office's criminal history calculations at sentencing, JA 452. The district court therefore placed Benton in criminal history category II; calculated his guidelines range accordingly; and sentenced him to the bottom of that 18-24 month range. JA 452, 456.

### B.  Standards of Review

Because Benton did not argue at trial that pardons based on a finding of innocence are inadmissible under Rule 404(b), this Court reviews the argument for plain error. *See United States v. David*, 96 F.3d 1477, 1480-81 (D.C. Cir. 1996); *supra*, at 20-21 (plain-error review).

This Court reviews for clear error the district court's factual finding that Benton did not receive an innocence-based pardon. *See Awad v. Obama*, 608 F.3d 1, 6-7 (D.C. Cir. 2010) (reviewing for clear error factual findings based on "documentary evidence"); *cf. Watkins v. Thomas*, 623 F.2d 387, 388 (5th Cir. 1980) ("The district court found as a fact that the Presidential pardon was not based on subsequent proof of innocence.").

Meanwhile, although Benton initially objected to using his pardoned convictions at sentencing, he abandoned the claim at sentencing.  JA 452.  This Court should therefore decline to review his Guidelines claim. *See United States v. Moore*, 703 F.3d 562, 571-72 (D.C. Cir. 2012).  Even if preserved, any claim on this front would be reviewed for plain error, as Benton did not object at sentencing.

### C.    Federal Rule of Evidence 404(b)(2) Did Not Plainly Prohibit Using Benton's Prior Pardoned Convictions.

**1.**    The President has the exclusive constitutional authority to pardon those who have committed or been convicted of a federal crime. U.S. Const. art. II, § 2, cl. 1; *United States v. Klein*, 80 U.S. 128, 147 (1871). These pardons are "act[s] of grace by which an offender is released from the consequences of his offence, so far as such release is practicable and within control of the pardoning power." *In re North*, 62 F.3d 1434, 1435 (D.C. Cir. 1994) (per curiam). In doing so, they end punishment and consequences associated with a crime. *Id.* at 1437. But they do not "blot out guilt or expunge a judgment of conviction." *Id.*

The President may grant a pardon for many reasons. *See In re Aiken Cnty,* 725 F.3d 255, 263, 265 n.10 (D.C. Cir. 2013). For example, the President may pardon a violation of federal law because of "constitutional concerns about [the] law *or* because of policy objections to the law." *Id.* at 263. Presidents have also granted general amnesties to those who violated federal law. *See Richards v. United States*, 192 F.2d 602, 605 (D.C. Cir. 1951) (World War II veterans). And pardons have historically issued on grounds of innocence. *Herrera v. Collins*, 506 U.S. 390, 415 (1993).

52

A once-pardoned defendant may eventually return to court as a witness or party in either a criminal or civil capacity. *See Richards*, 192 F.2d at 605. His prior conviction may there prove substantively relevant to a case's merits or to his character for truthfulness as a witness. *See* Fed. R. Evid. 404(b), 609. That leads to questions about whether the now-pardoned convictions and underlying acts may enter evidence.

Federal Rule of Evidence 609(c) makes different judgments about impeaching a witness's truthfulness with a pardoned conviction based on the reasons underlying the pardon. A party may never use convictions pardoned based on "a finding of innocence" under Rule 609. Fed. R. Evid. 609(c)(2). And sometimes, a party may not impeach a witness with convictions pardoned because of "a finding that the [witness] has been rehabilitated." Fed. R. Evid. 609(c)(1). Convictions pardoned for any other reason remain admissible under this rule. *See United States v. Hamilton*, 48 F.3d 149, 154 (5th Cir. 1995).

By contrast, Federal Rule of Evidence 404(b) does not address when a party may use a pardoned conviction as substantive evidence. But it broadly allows a party to introduce "[e]vidence of any other crime, wrong, or act" for any relevant non-character purpose. *United States v. Long*,

53

328 F.3d 655, 660-61 (D.C. Cir. 2003). The rule even permits a court to admit evidence of past conduct "that is neither criminal nor unlawful" or conduct as to which "the defendant may . . . have been acquitted." *Id.* at 661.

**2.a.** Against this backdrop, the district court did not plainly err in admitting Benton's pardoned convictions under Rule 404(b). That rule allows admitting evidence of relevant "acts" for non-character purposes. *See Long*, 328 F.3d at 660-61. Its language "is plain," containing no bar on admitting particular types of acts. *United States v. Rogers*, 918 F.2d 207, 210-11 (D.C. Cir. 1990) (juvenile adjudications admissible). Indeed, because Rule 404(b) accepts proof of even non-criminal "acts," *Long*, 328 F.3d at 661, the facts underlying an "expunged" conviction remain admissible under this rule, *United States v. Kelley*, 981 F.2d 1464, 1472-73 (5th Cir. 1993).

By like reasoning, pardoned convictions and their underlying facts are not plainly inadmissible under Rule 404(b). A pardon does not "blot out guilt," let alone "expunge a judgment of conviction." *North*, 62 F.3d at 1437. It certainly does not "create any factual fiction" that a defendant did not face conviction or take a particular act. *Id.* Even innocence-based

pardons cannot alter reality such that a particular act never occurred; they, like expungement or judicial vacatur of convictions, at most erase a "*conviction.*"  Fed. R. Evid. 609, Advisory Committee Note; *see Kelley*, 981 F.2d at 1472-73; Br. 32.  If sufficiently proven for Rule 404(b) purposes, *see United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994), the underlying acts remain—and remain admissible (subject to Rule 403).

Benton counters by seeking to import into Rule 404(b) the text of Rule 609(c).  Br. 31, 33.  But Rule 609 focuses on using "convictions" to impeach a witness's truthfulness, not introducing "acts" to prove a substantive point.  *See* Fed. R. Evid. 609(a); *Rogers*, 918 F.2d at 211. Rule 609(c) then explicitly forbids introducing "convictions" pardoned based on innocence to impeach a witness, as the rule treats such convictions as "nullif[ied] . . . *ab initio*."  Fed. R. Evid. 609, Advisory Committee Note.  All this makes "[t]he language of the two rules . . . plain" and different, and this Court should not "conflate them." *Rogers*, 918 F.2d at 211; *cf. Richards*, 192 F.2d at 605 ("Since the rule is statutory . . . there may be real doubt as to our power to create such an exception.").

**b.**  Even if Rule 404(b) did silently yet plainly forbid admitting convictions subject to innocence-based pardons, the district court did not

clearly err in finding that Benton received no such pardon here. Neither the pardon itself nor the Press Secretary's press release about the pardon suggested, let alone compelled, such a finding.

Benton's actual pardon contained no finding of innocence. It stated that the President had granted Benton a "full and unconditional pardon" for his "conviction" on the superseding indictment in his prior case. JA 341 (capitalization altered). The pardon further flagged the sentence that Benton had already served for his crimes. *Id.* Nothing about the pardon then "purport[ed] to address [Benton's] innocence or guilt." *United States v. Schaffer*, 240 F.3d 35, 38 (D.C. Cir. 2001) (discussing a similar pardon); *cf. Prisament v. United States*, 92 Ct. Cl. 434, 435 (1941) (attaching a pardon from President Roosevelt declaring "Martin Prisament [] innocent of the offense for which he is now being held"). That plausibly ends the matter.

If the Press Secretary's press release could cast light on the President's motivations,[13] it also did not suggest that Benton received an

---

[13] *But see* 28 U.S.C. § 2513(b) (requiring an innocence-based finding in the pardon itself for damages suit based on unjust conviction and imprisonment); *In re Sealed Case*, 121 F.3d 729, 740-41 (D.C. Cir. 1997)

innocence-based pardon. The press release contained no statement suggesting that Benton had not taken the actions that led to his convictions. Quite the contrary, the press release acknowledged the predicate "payments to a state Senator," JA 348-49, that Benton illegally caused to be concealed from the FEC. It also noted Benton's "convict[ion]" and already-completed sentence of "6 months home confinement and 2 years' probation." *Id.* None of this signals innocence; it nods to guilt punished and forgiven by executive grace. *See North*, 62 F.3d at 1435, 1437.

As the district court noted, the press release did not even contain a statement from the President as to why he pardoned Benton. It instead noted that a "former" FEC Chairman supported the pardon and that, "[a]ccording to [him], the reporting law violated was unclear and not well established at the time" of Benton's convictions. JA 348-49. This "according to" language directly attributed that view to a "*former*" FEC Chairman who "supported" Benton's pardon, not to a current official or the Press Secretary—let alone the President. The press release therefore

_____

(stating that a "White House press statement . . . was not an official response to [a] subpoena").

57

remains silent as to "what persuaded the President to take action." *Contra* Br. 35. *Cf. Hamdan v. Rumsfeld*, 548 U.S. 557, 623 n.52 (2006) (explaining that the Court has not looked to media-aimed statements from acting Cabinet members to evaluate the "legality of executive action").

But even attributing the former FEC Chairman's statement to the President, it still would not count as an innocence-based finding. The statement does not find Benton factually innocent. It also does not declare the at-issue law unconstitutionally vague and thus void. "[T]he fact that a statutory construction question may be difficult or unresolved" and require judicial elaboration "does not make [a] law unconstitutionally vague." *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1305 (D.C. Cir. 2023). The reporting law being merely "unclear and not well established *at the time*," JA 349 (emphasis added), does not signal that the law will prove forever indeterminate and thus vague. (If anything, the at-the-time phrasing implies that the law had already grown clearer).

**3.** If admitting Benton's convictions amounted to plain error, that error did not affect his substantial rights. Other evidence powerfully

demonstrated Benton's guilty mind when it came to his knowing and willful FECA violations and his Section 1519 intent to obstruct. Benton knew that foreign-national contributions were illegal, *see* JA 152-56, 174, 254-55, and he thus masked his and Vasilenko's roles in the contribution to Trump Victory. For example, Benton used a false-invoicing scheme to launder Vasilenko's donation; avoided revealing Vasilenko's nationality to the fundraising team; sent false exculpatory emails suggesting that the roundtable never occurred; tried not to send Vasilenko's donation to Trump Victory; deleted incriminating emails relating to that donation; and lied to Trump Victory about who had made the donation for Vasilenko's ticket. *See, e.g.*, JA 152-55, 196-207, 211-12, 219-29. Given that evidence, Benton's trial would have turned out the same even without introducing his prior convictions, and he cannot show an effect on his substantial rights. *See Khatallah*, 41 F.4th at 628.

### D.    If Not Waived, Benton's Plain-Error Pardon-Related Sentencing Claims Fail.

Benton raises in passing several sentencing claims based on his belief that his pardoned convictions could serve no purpose in this case. Br. 37-38. As explained, any challenge to Benton's criminal-history calculation is waived because he abandoned the issue. *Supra*, at 51. On

59

the merits, his arguments fail because the pardon and press release did not plainly reflect a presidential finding of any kind—let alone one of "innocence or errors of law." *Supra*, at 55-58.  The former FEC Chairman lacked authority to speak for the President, and his statement that the law was "unclear and not well established at the time" of Benton's crimes reflects neither Benton's innocence nor an error of law.  *See* U.S.S.G. § 4A1.2(j), comment. (n.10) (2021).  Finally, his criminal-history category and Guidelines range would not have changed even without the criminal-history point he received for these convictions.  *See* SJA 4; U.S.S.G., Ch.5, Pt. A (2021).

## IV.  The Rule 404(b) Limiting Instruction Suffered No Plain, Reversible Error.

Benton finally faults (Br. 39) the district court's Rule 404(b) instruction for the jury about the pardoned convictions.  That instruction suffers from no plain, reversible error.

### A.    Background

After admitting Benton's prior convictions under Rule 404(b), the district court gave the jury an interim limiting instruction about that evidence.  JA 272-73.  The court then asked the parties to prepare a refined instruction for the final jury instructions.  JA 273.  The

government prepared that final instruction, which the defense deemed consistent with the court's Rule 404(b) ruling.  JA 294.

Without objection then, the district court instructed the jury that it could use Benton's prior convictions and acts for two "limited" purposes. The jury could weigh that evidence as to:

> (1) whether Benton "acted knowingly and on purpose and willfully, and not by mistake or accident or in good faith" in this case; and
>
> (2) whether, if the offenses were "so similar to the charged offenses that it is likely that the same person committed both of them, . . .
>
> Benton is the person who committed the crimes" charged here.

JA 386-87; *see also* JA 295, 301-02 (no defense objection).  The court further instructed the jury not to "use this evidence for any other purpose" or "to conclude that [Benton] has a bad character or . . . criminal personality." JA 387.  The court emphasized that "Benton is only on trial for the crimes charged" and that "[t]he law does not allow you to convict Mr. Benton simply because you believe he may have done bad things not specifically charged" in this case.  *Id.*

61

### B.      Standard of Review

Benton never objected to the district court's Rule 404(b) instruction, and plain-error review thus governs his new limiting-instruction claim. *See McGill*, 815 F.3d at 889; *supra*, at 20-21 (plain-error standard).  It makes no difference that the court overruled Benton's pretrial evidentiary objection to the relevant Rule 404(b) evidence.  *Compare id.* at 880-81 (objection), *with id.* at 889 (plain-error review for jury-instruction claim).  *Contra* Br. 42-43.  No jury instructions had even been drafted, *compare* JA 105-13, *with* JA 122-48, and a later objection would not have proved "senseless," *United States v. Wilson*, 26 F.3d 142, 160 (D.C. Cir. 1994).

### C.      The Rule 404(b) Limiting Instruction Did Not Plainly or Reversibly Mislead the Jury.

1.      A Rule 404(b) instruction "should identify the evidence at issue and the particular purpose for which a jury could permissibly use it." *McGill*, 815 F.3d at 889.  But the question is whether the instruction "taken as a whole, . . . accurately state[s] the governing law and provide[s] the jury with sufficient understanding of the issues and applicable standards." *Id.* at 888.

62

As a whole, this Rule 404(b) instruction did so. It allowed the jury to use Benton's prior crimes for "only" the two "limited purposes" that the district court had sanctioned: Benton's *modus operandi* and *mens rea*. JA 110, 386-87; *accord* JA 294 (defense counsel agreeing). The instruction then rightly and repeatedly forbade the jury from using this evidence for propensity purposes. JA 386-87.

As to *modus operandi*, the Rule 404(b) instruction allowed the jury to find that Benton had a "plan" to conceal his crimes via false invoices. *United States v. Johnson*, 970 F.2d 907, 914 (D.C. Cir. 1992). Benton's past crimes had involved "intermediary companies" and "false invoices" to "conceal . . . payments to [a] state senator." JA 334-35. And the Indictment here alleged that Benton employed a similar scheme to hide Vasilenko's contribution. JA 26-27. The instruction thus permissibly allowed the jury to use Benton's prior crimes to find such a scheme—*i.e.*, that "Benton is the person who committed the crimes as charged in the indictment." JA 386; *cf. Nelson v. City of Chicago*, 810 F.3d 1061, 1071 (7th Cir. 2016) (approving admission of evidence probative to "*modus operandi* of creating fraudulent documents").

63

Benton criticizes this part of the limiting instruction by reading it to (1) concern his "identity" as the one who took the criminal acts here and, (2) then, because his "identity . . . was never in dispute," invite the jury to make barred propensity inferences. Br.39-40. Yet to reach that conclusion he overlooks that *modus operandi* evidence can serve functions besides proving a perpetrator's "identity." Br. 40. *United States v. Sampol*, 636 F.2d 621, 659 (D.C. Cir. 1980) (per curiam) (intent, plan, preparation, and motive). He then fails to consider the instruction "as a whole" and how a jury must have understood this language next to many warnings against propensity inferences. *See McGill*, 815 F.3d at 888. Those warnings and the fact that at least "[o]ne use listed by the jury instructions was actually at issue," *i.e.*, Benton's state of mind, prevents any finding of "plain" error. *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006); *McGill*, 815 F.3d at 889.

**2.**    If plain error did occur, it did not affect Benton's substantial rights, as no "reasonable probability" exists that a properly instructed jury would have acquitted him. *Khatallah*, 41 F.4th at 628. Nor did it seriously affect the fairness, integrity, or public reputation of his trial. *See Clarke*, 24 F.3d at 266.

64

In particular, Benton cannot show prejudice even to the extent the instruction permitted the jury to consider the evidence on the undisputed issue of "identity." "[O]verwhelming evidence" apart from his prior convictions established Benton's "identity," *United States v. Fraser*, 448 F.3d 833, 842 (6th Cir. 2006), as the one who received $100,000 from Vasilenko, sent a quarter of that money to Trump Victory, and claimed falsely to have made the at-issue donation, JA 208-11, 223-24. Put another way, any finding that Benton himself brought about criminal acts in this case (a necessary predicate step to his conviction) did not depend at all on evidence of his prior convictions. *See United States v. Henry*, 848 F.3d 1, 10 (1st Cir. 2017) ("Nothing in the facts or argument at trial pointed to a finding of modus operandi as a pathway to a guilty verdict that was not far more likely to have been provided by a finding of intent."); *Fraser*, 448 F.3d at 842 (same principle).

The Rule 404(b) instruction as a whole also prevented the jury from using the prior convictions as "propensity evidence pure and simple." *Estelle v. McGuire*, 502 U.S. 62, 74-75 (1991). *Contra* Br. 43-44. The district court repeatedly "admonished that the evidence could *not* be employed for propensity purposes," *McGill*, 815 F.3d at 889, and thus

65

"addressed the chief evil associated with 'other act' evidence," *Fraser*, 448 F.3d at 842. It told the jury:

- "You may not use this evidence for any other purpose";

- "Mr. Benton is only on trial for the crimes charged";

- "[Y]ou may not use this evidence to conclude that [Benton] has a bad character or . . . criminal personality"; and

- "The law does not allow you to convict Mr. Benton simply because you believe he may have done bad things not specifically charged."

JA 387. "[These] instruction[s] directly addressed the concern that the jury would use the evidence for the improper purpose about which Rule 404 is most concerned." *Fraser*, 448 F.3d at 842; *accord Henry*, 848 F.3d at 10; *McGill*, 815 F.3d at 889.

Finally, the government did not urge any propensity inference in summation. *Contra* Br. 39-40. It reminded the jury to consider Benton's prior convictions for the "very limited purpose" of "knowledge and willfulness" and "modus operandi." JA 306-07, 314. And its brief "[d]oes this help you identify" statement is harmless. JA 314. "Identity" once again did not play any real role at trial, and the district court's Rule

66

404(b) non-propensity instructions prevented the jury from drawing prohibited inferences from the evidence. *See United States v. Venable*, 269 F.3d 1086, 1091 (D.C. Cir. 2001).

## CONCLUSION

This Court should affirm the district court's judgment.

Respectfully submitted,

| | |
|---|---|
| ROBERT HEBERLE<br>Deputy Chief | NICOLE M. ARGENTIERI<br>Acting Assistant Attorney General |
| LAUREN CASTALDI<br>Trial Attorney<br>Public Integrity Section | LISA H. MILLER<br>Deputy Assistant Attorney General |
| | /s/ W. Connor Winn |
| MICHELLE WASSERMAN<br>Assistant United States Attorney<br>Southern District of California | W. CONNOR WINN<br>U.S. Department of Justice<br>Criminal Division, Appellate Section<br>950 Pennsylvania Ave., NW<br>Washington, DC 20530<br>(202) 669-6551<br>William.Winn@usdoj.gov |

December 21, 2023

67

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,973 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared on a proportionally spaced typeface using Microsoft Word 2019 in 14-point Century Schoolbook font.

3.    This brief complies with the privacy redaction requirement of Fed. R. App. P. 25(a) because it contains no personal data identifiers.

4.    This brief has been scanned for viruses with the most recent version of McAfee Endpoint Security, version 10.7, which is continuously updated, and according to that program, is free of viruses.

/s/ W. Connor Winn
W. CONNOR WINN

68

## STATUTORY ADDENDUM

All applicable statutes are contained in the Opening Brief for Defendant-Appellant Jesse R. Benton.

## CERTIFICATE OF SERVICE

I certify that, on December 21, 2023, I served an electronic copy of this Final Appellee's Brief for the United States on all litigants via the Court's ECF system. I certify that all participants in the case are registered ECF users and that service will be accomplished through the ECF system.

/s/ W. Connor Winn
W. CONNOR WINN